NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 6

No. 2018-368

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Venessa Sarkisian-Kennedy | September Term, 2019 |

Michael R. Kainen, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Joshua O'Hara, Appellate Defender, Montpelier, for
  Defendant-Appellant.


PRESENT:  Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Skoglund, J. (Ret.),
                 Specially Assigned


¶ 1.    **EATON, J.**   Following a jury trial, defendant Venessa Sarkisian-Kennedy was convicted of operating a vehicle under the influence of alcohol, second offense (DUI-2), and criminal refusal of an evidentiary breath test (refusal). She seeks reversal of these convictions on appeal, arguing that the trial court erred in: (1) admitting—subject to what she contends was an ineffective limiting instruction—the results of a horizontal gaze nystagmus (HGN) test offered by the State absent scientific, foundational testimony from an expert witness; and (2) allowing the State to present evidence of her refusal to consent to a preliminary breath test (PBT) on the theory that it was relevant to consciousness of guilt. We reverse and remand the refusal conviction and affirm the DUI-2 conviction.

¶ 2. Prompted by concerns that defendant was driving with a suspended license, a Wilmington police officer made contact with her on the night of January 26, 2018. During this encounter, officers developed a further suspicion that defendant had been driving under the influence of alcohol. In connection with the ensuing DUI investigation, defendant participated in field-sobriety tests, including an HGN test. However, upon request, she declined to provide police with either preliminary or evidentiary samples of her breath. She was subsequently charged with DUI-2, refusal, and operating a vehicle under license suspension for DUI (OLS-DUI). Prior to trial, defendant pleaded guilty to OLS-DUI and admitted the existence of her prior DUI conviction, an essential element of DUI-2. She also filed two motions in limine, seeking to preclude the State from offering evidence of the HGN test results and her refusal to take the PBT. Before describing the grounds for defendant's motions, some background on the HGN and PBT tests and the legal framework governing their administration is helpful.

¶ 3. The HGN is a field-sobriety test in which officers look for involuntary jerking of the eyes—known as nystagmus—as a subject tracks an object across his or her field of vision. See State v. Wilt, 2014 VT 114, ¶ 9 n.2, 198 Vt. 1, 109 A.3d 439; State v. Blouin, 168 Vt. 119, 120 n.1, 716 A.2d 826, 827 n.1 (1998). An "overabundance" of eye twitching suggests possible intoxication. Blouin, 168 Vt. at 120 n.1, 716 A.2d 826, 827 n.1. While Vermont's DUI statute "is silent with respect to physical sobriety tests such as the HGN," see id. at 122, 716 A.2d at 828, our case law provides that, as with other physical sobriety exercises, an officer may request an HGN test where he or she can "point to specific articulable facts which, taken together with rational inferences from these facts, reasonably warrants the intrusion." State v. Gray, 150 Vt. 184, 191, 552 A.2d 1190, 1194 (1988).

¶ 4. In contrast, the administration of both preliminary and evidentiary blood tests is governed by statute. See 23 V.S.A. §§ 1202(a)(3), 1203(f). The PBT is "an investigatory tool used by officers in the field to ascertain whether probable cause exists to believe that an individual

2

has been driving under the influence of alcohol." State v. Schapp, 2019 VT 27, ¶ 11, __ Vt. __, 212 A.3d 1226 (quotation omitted). An officer may request a PBT if he or she "has reason to believe that a person may be" or has been driving under the influence. 23 V.S.A. § 1203(f). "The results of this preliminary screening test may be used for the purpose of deciding whether an arrest should be made and whether to request an evidentiary test and shall not be used in any court proceeding except on those issues." Id. But an evidentiary breath test, "as its name implies, 'is one that is intended to be introduced as evidence.' " Schapp, 2019 VT 27, ¶ 12 (quoting 23 V.S.A. § 1200(3)). Because an evidentiary breath test may be used as substantive evidence of guilt, an officer may only request one when he or she "has reasonable grounds to believe" that a person was driving under the influence. Id.; 23 V.S.A. § 1202(a)(3). "Reasonable grounds" are "akin to probable cause." State v. Perley, 2015 VT 102, ¶ 18, 200 Vt. 84, 129 A.3d 93.

¶ 5. In her motion in limine, defendant argued that HGN tests are scientific in nature and, as such, subject to the admissibility standards set forth in Vermont Rule of Evidence 702. Absent testimony from a witness qualified as a scientific expert, she contended, the State could not admit evidence pertaining to the HGN test. The State responded that an administering officer's testimony regarding HGN results is admissible, without more, with respect to a refusal charge—specifically, the jury's determination of whether the officer had reasonable grounds to request an evidentiary breath sample. 23 V.S.A. § 1202(a)(3). It urged the court to conclude that HGN evidence is categorically admissible for this purpose on the basis of decisions rendered by appellate courts in other jurisdictions, a procedure outlined by this Court in State v. Kinney, 171 Vt. 239, 249-250, 762 A.2d 833, 842-43 (2000).

¶ 6. In ruling on the motion, the court did consider decisions from other jurisdictions. It also cited the HGN-related testimony of a police officer taken in a separate case apparently then pending before the same judge, as well as a "series of studies"—the provenance of which is unclear on this record, as the court did not hold an evidentiary hearing on the motion—evaluating the HGN

3

test's known rate of error. On this basis, the court concluded that the HGN test satisfied two of Rule 702's three prongs: it was "based on sufficient facts and data" and "the product of reliable techniques and methods." See V.R.E. 702. However, the court went on to hold that, absent the testimony of "someone like" the officer who testified in the other case before the court, it could not be assured that those techniques and methods had been applied reliably to the facts of the case at bar. On this basis, the court concluded that the officer could testify only that he was trained to carry out "an exercise which observes eye movements," he administered this test to defendant in accordance with his training, and what he subsequently observed "can be associated with impairment." The court further indicated that it would issue a limiting instruction explaining that, while the jury could use the HGN evidence to evaluate the reasonableness of the officer's request for the evidentiary breath test, jurors could not consider it with regard to the underlying issue of defendant's impairment.

¶ 7. Defendant renewed this motion prior to the commencement of trial, arguing that the limited scope of the testimony allowed under the court's ruling was still an admission of the test absent an appropriate scientific foundation. She further indicated her belief that the HGN test result was a "crucial piece of evidence" in the State's DUI-2 case, and, as a result, a limiting instruction would not cure the prejudice resulting from its admission in the absence of expert testimony. The court declined to reconsider its ruling, but expanded on its prior reference to the HGN testimony it heard in the other case, where "the 702 issue was pretty heavily litigated," noting that the officer who testified "is not just your regular road cop, but . . . has been all over the country taking medical trainings and understands quite a bit." The court clarified that the other decision had yet to issue but would "probably" conclude that HGN evidence was admissible based on that officer's testimony and the court's consideration of appellate decisions from other jurisdictions. Reiterating that, in the absence of expert testimony, the evidence was inadmissible with respect to the DUI-2 charge, the court continued to hold that it was admissible with respect to the

4

reasonableness of the officer's request for an evidentiary breath test so long as it was not "impugned with any type of scientific gloss."

¶ 8. At this time, the court also ruled on defendant's pending motion to exclude evidence regarding her refusal to provide a preliminary breath sample. Defendant argued that the language of 23 V.S.A. § 1203(f) precludes the admission of a driver's refusal to submit to a PBT—not just the numerical result of a PBT—as substantive evidence. The court, rejecting this argument, held that testimony regarding defendant's refusal to perform the PBT was evidence of consciousness of guilt, and therefore relevant and admissible.

¶ 9. During the trial, the following evidence was presented through the testimony of defendant and three police officers. Officer Corey Briggs was on patrol in Wilmington on the evening of January 26, 2018, when he recognized a passing vehicle as belonging to—and being driven by—defendant, who he knew. Because he believed defendant's license was suspended, Officer Briggs began to follow her vehicle. He observed no erratic operation during this time; rather, defendant proceeded to signal appropriately, turn into a municipal lot, and park her car.

¶ 10. Officer Briggs followed, making contact with defendant to address his concerns that defendant was driving while under suspension. Defendant initially denied knowledge of her license suspension, indicating that she had received no paperwork to this effect, but subsequently conceded that her license was likely suspended. Although he did not testify that he detected an odor of alcohol during this exchange, Officer Briggs was suffering from a cold at the time and could not smell anything.

¶ 11. During the stop, Officer Briggs's colleague, Officer Patrick Brewer, arrived on scene as backup, heralding a marked change in defendant's demeanor. Defendant was agitated, combative, and belligerent toward Officer Brewer; at trial, she acknowledged that she was upset with him following an earlier professional encounter. After other efforts to de-escalate defendant were met with no success, Officer Brewer placed her in handcuffs. Upon being thus detained,

defendant turned to face Officer Brewer and began to curse at him. At this proximity, he could smell the odor of intoxicants on her breath, leading him to develop suspicion that she had been driving under the influence.

¶ 12. Officer Brewer, after considering defendant's contentious attitude toward him and Officer Briggs's impaired olfactory abilities, sought the assistance of Officer Samuel Morris of the nearby Dover Police Department to administer field-sobriety exercises at the Wilmington station. Although this ended Officer Brewer's direct involvement in the investigation, defendant's demeanor remained combative and slightly argumentative.

¶ 13. Officer Morris has substantial training and experience in DUI processing. Upon initially sitting between twenty-four and thirty inches from defendant, Officer Morris smelled the odor of alcohol. At the start of the field-sobriety tests, standing less than eighteen inches away from defendant, he continued to smell alcohol. When he advised defendant of his observations, she "exhaled very aggressively" in his face, resulting in a "very, very strong" odor of alcohol. She attributed the smell to having "bad teeth" and having recently consumed fruit. In Officer Morris's training and experience, neither factor cited by defendant would cause a person's breath to smell of alcohol. However, defendant denied having consumed alcohol in the last several days.

¶ 14. Officer Morris administered the HGN test, along with the walk-and-turn and one-leg stand, both of which are physical sobriety exercises. With regard to the HGN—and consistent with the court's order—Officer Morris testified on direct examination only that he administered, in accordance with his training and experience, a field-sobriety test which involved looking at defendant's eyes, and that what he observed can be associated with alcohol impairment. The court immediately admonished the jury:

> With respect to the movement he saw in the eyes, you are to look at that only with respect to the reasonableness of his request for an evidentiary test. You are not to take it with respect to impairment. Okay? So, there are two parts of the case. And you can only look

6

at it with respect to the reasonableness of the request, not with respect to impairment.

During cross-examination, defendant's attorney asked Officer Morris whether he was aware of other causes for the "eye movement" he testified about on direct examination. In response, Officer Morris agreed that there "are many, many causes for nystagmus . . . . and that's one of the reasons we go by the totality of the circumstances." He explained that, for this reason, officers are taught to inquire about naturally occurring conditions which could cause nystagmus and to check for resting nystagmus and pupil size before administering an HGN test. Officer Morris could not recall whether he inquired of defendant regarding any such conditions, but explained that he checked for resting nystagmus and equal pupil size at the start of the exercise. When asked to define nystagmus, Officer Morris explained that "nystagmus is . . . on the most basic level, a jerking of the eye." He noted that some individuals have "resting nystagmus," while others experience nystagmus as a result of reading for a long time, drug use, or head injury. Explaining that he was "not the expert of the eyeball," Officer Morris acknowledged that there are many different types and causes of nystagmus.

¶ 15. Officer Briggs—who observed the tests as Officer Morris administered them—saw defendant sway slightly as she stood to take the HGN, which he took as a sign of impairment. However, he explained that he was not in a position to observe the results of the HGN test Officer Morris administered. He did notice that defendant's eyes were bloodshot and watery, though he acknowledged this may have been caused by defendant crying.

¶ 16. Officer Morris evaluated defendant's performance on the walk-and-turn and one-leg stand exercises, both of which, he explained, are intended to evaluate a subject's mental functioning in relation to his or her physical ability. Officer Briggs noticed defendant both step off the position where Officer Morris directed her to stand and sway as she stood. When instructed to count out loud, defendant skipped the number twelve. Officer Morris felt that defendant's

7

overall performance on the tests was "slow and deliberate," indicating impairment; in his experience, subjects normally complete these exercises more quickly.

¶ 17. After considering the results of the field-sobriety tests in connection with the totality of the circumstances, it was Officer Morris's opinion that defendant was moderately to severely impaired. "A very large portion" or "the majority" of his opinion was based on the HGN results, although he also considered other indicia of impairment and noted one "clue" on the walk-and-turn. Based on his own, more limited, observations, Officer Briggs believed defendant was slightly to moderately impaired.

¶ 18. At this point, Officer Morris requested that defendant provide a preliminary sample of her breath. She responded that she would prefer not to, based on concerns about accuracy, instead indicating her preference for a blood test. A blood test was not available at the police station. Officer Morris took defendant's response as a refusal.

¶ 19. Defendant was subsequently processed for DUI. When Officer Briggs asked defendant whether she would take an evidentiary breath test, defendant responded by holding up her middle finger toward him. Defendant agreed, based on this response, that she declined to take the evidentiary breath test.

¶ 20. At the close of the evidence, defendant requested that the court reiterate, in its instructions to the jury, the limiting instruction given with respect to the HGN test. The court declined to give an additional limiting instruction but held that the parties could comment on the HGN in closing arguments only with respect to the refusal count. In its closing remarks, the State noted that defendant's refusal to take an evidentiary breath test was "another piece of evidence you can consider in determining beyond a reasonable doubt that defendant was operating under the influence of intoxicating liquor." Although the State's attorney commented separately on defendant's PBT refusal, he noted it was "just a preliminary test, and the result would not have been admissible."

8

## I. Admission of HGN Test Result

¶ 21. Defendant argues that, absent expert testimony, the trial court's ruling admitting limited evidence regarding the HGN test violated Vermont Rule of Evidence 702. She further contends that, in relying on testimony offered in a separate case, the trial court violated Vermont Rule of Evidence 605, which prohibits a judge from acting as a witness in a trial over which he or she presides. The State responds that HGN test results are admissible without expert testimony where they are offered only to show the reasonableness of an officer's belief that a defendant was driving under the influence. It urges us to conclude that defendant was not prejudiced by the trial court's reliance on testimony from another proceeding, arguing that the court used that testimony to rule in defendant's favor.

¶ 22. "Our standard of review on evidentiary rulings is deferential." State v. Herring, 2010 VT 106, ¶ 4, 189 Vt. 211, 19 A.3d 81. We will reverse a trial court's decision to admit evidence only if the appellant can show that the court withheld or abused its discretion. State v. Gemler, 2004 VT 3, ¶¶ 11, 13, 176 Vt. 257, 844 A.2d 757. "Absent such a showing, we will not disturb a reasonable discretionary ruling of the trial court, even if another court might have reached a different conclusion." Herring, 2010 VT 106, ¶ 4 (quotation omitted).

¶ 23. Under the Vermont Rules of Evidence, where

> scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

V.R.E. 702. Trial courts therefore bear the responsibility of acting as "gatekeepers who screen expert testimony[,] ensuring that it is reliable." USGen New Eng., Inc. v. Town of Rockingham, 2004 VT 90, ¶ 19, 177 Vt. 193, 862 A.2d 269. Because Rule 702, in its original form and as

9

amended, is substantively identical to Federal Rule of Evidence 702, Vermont courts apply the analytical framework outlined by the United States Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). See State v. Streich, 163 Vt. 331, 342-43, 658 A.2d 38, 46-47 (1995); Reporter's Notes—2004 Amendments, V.R.E. 702.

¶ 24.    Under Daubert, "reliability is assured if the evidence is supported by 'scientific knowledge.' " USGen New Eng., Inc., 2004 VT 90, ¶ 16 (quoting Daubert, 509 U.S. at 589-90). "Scientific knowledge" is comprised of inferences or assertions derived through the scientific method. Id. The following nonexhaustive list of factors identified in Daubert assists courts in determining whether expert testimony is sufficiently supported by scientific knowledge:

> (1) whether the scientific technique or methodology involved can be tested; (2) whether the technique or methodology has been subjected to peer review and publication; (3) the known or potential rate of error particular to the technique or methodology; and (4) whether the technique or methodology has been generally accepted in the scientific community.

Id. (citing Daubert, 509 U.S. at 593-94).

¶ 25.    Although only an expert witness "may testify on the basis of facts or data other than those directly perceived by him," lay witnesses, too, may offer testimony in the form of an opinion or inference, provided it is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." V.R.E. 701; see also Reporter's Notes, V.R.E. 701—2004 Amendment (observing that Rule 701 "puts counsel on notice that a witness must be qualified under Rule 702 if the opinion of the witness goes beyond common experience and should be based upon specialized knowledge"). This Court has long recognized that, "[w]here alcohol is involved . . . a lay person, on the basis of his personal observations, is competent to give his opinion as to the sobriety of an individual, because it takes

no special scientific knowledge or training to recognize intoxication." State v. Rifkin, 140 Vt. 472, 476, 438 A.2d 1122, 1124 (1981) (citation omitted).

¶ 26. The difference between expert and lay testimony is key to understanding the distinct schools of thought that have developed across jurisdictions on the foundational prerequisites to admission of HGN evidence.[1] See Hulse v. State, Dep't of Justice, Motor Vehicle Div., 1998 MT 108, ¶ 64, 961 P.2d 75 (recognizing that "throughout other jurisdictions, three different lines of cases concerning the admissibility of HGN test results have evolved"). Some courts conclude that the HGN test is analogous to other standardized field-sobriety tests in that it is nonscientific in nature, and, as a result, foundational expert testimony is unnecessary. Id.; see also, e.g., State v. Murphy, 451 N.W.2d 154, 157-158 (Iowa 1990) (concluding that testimony of properly trained police officer was sufficient to admit HGN evidence, despite exam's "pretentiously scientific name," because "[t]he ease with which the test may be administered and evaluated obviates the need for a more scientific interpretation"); State v. Sullivan, 426 S.E.2d 766, 769 (S.C. 1993) (holding "that evidence resulting from HGN tests, as from other field sobriety tests, is admissible when the HGN test was used to elicit objective manifestations of soberness or insobriety"). Others hold that the HGN test is scientific in nature, but foundational expert testimony is unnecessary in every case because the reliability of the test has been established. Hulse, 1998 MT 108, ¶ 64; see, e.g., State v. Garrett, 811 P.2d 488, 490 (Idaho 1991) (looking to decisions from other jurisdictions to support conclusion that HGN evidence is reliable "[b]ecause the reliability of a test based on scientifically tested phenomenon should not vary from jurisdiction to jurisdiction"). As the Supreme Court of North Dakota has observed, "[i]n effect, based upon

---

[1] Notably, however, there exists broad consensus that the purpose for which such evidence may be admitted is circumscribed. See State v. Ito, 978 P.2d 191, 198-99 (Haw. Ct. App. 1999) (collecting cases holding that "HGN test results may be admitted as evidence of probable cause to arrest a person for DUI, although not to prove intoxication or that a defendant's [blood-alcohol content] exceeded a particular percentage").

the conclusions of other courts in other cases, these courts have held the HGN test scientifically reliable as a matter of law." City of Fargo v. McLaughlin, 512 N.W.2d 700, 705 (N.D. 1994) (collecting cases). Finally, a third line of cases "require HGN test results to be scientifically validated in each individual case, or at least recognized as scientifically valid once by an appellate court within the jurisdiction." Id. at 706 (quotation omitted); see, e.g., State v. Dahood, 814 A.2d 159, 168 (N.H. 2002) (concluding that HGN test satisfies Daubert and noting, "under the doctrine of stare decisis, our decision today will be binding and, as a result, courts will not be required to establish the scientific reliability of the HGN test . . . in future cases").

¶ 27. In determining where we fall on this spectrum, we first conclude that the physiological underpinnings of the observations underlying the HGN exam fall well outside the ken of the layperson. We agree with the Supreme Court of Tennessee, which explained that the HGN test "differ[s] fundamentally" from other field-sobriety exercises "because the witness must necessarily explain the underlying scientific basis of the test in order for the testimony to be meaningful to a jury." State v. Murphy, 953 S.W.2d 200, 202 (Tenn. 1997). Physical field-sobriety exercises,

> in marked contrast, carry no such requirement. For example, if a police officer testifies that the defendant was unable to walk in a straight line or stand on one foot or count backwards, a jury needs no further explanation of why such testimony is relevant to or probative on the issue of the defendant's condition. A juror can rely upon his or her personal experience or otherwise[-]obtained knowledge of the effects of alcohol upon one's motor and mental skills to evaluate and weigh the officer's testimony. However, if a police officer testifies that the defendant exhibited nystagmus, that testimony has no significance to the average juror without an additional explanation of the scientific correlation between alcohol consumption and nystagmus. In effect, the juror must rely upon the specialized knowledge of the testifying witness and likely has no independent knowledge with which to evaluate the witness's testimony.

Id. at 202-03; see also Commonwealth v. Sands, 675 N.E.2d 370, 373 (Mass. 1997) (observing that while "[a] lay juror understands that intoxication leads to diminished balance, coordination,

12

and mental acuity from common experience and knowledge," testimony of result of HGN test relies on "an underlying assumption" regarding relationship between nystagmus and intoxication which is outside jurors' experience). Although we continue to hold that "it takes no special scientific knowledge or training to recognize intoxication," horizontal gaze nystagmus is not among the personal observations—like forgetting a number while counting or swaying while standing—that may support a lay opinion on that topic. Rifkin, 140 Vt. at 476, 438 A.2d at 1124. Where, as here, "a physical process is obscure, abstruse[,] or so far outside common experience that lay jurors can only speculate about it[,] expert testimony is required to explain the process." S. Burlington Sch. Dist. v. Calcagni-Frazier-Zajchowski Architects, Inc., 138 Vt. 33, 46, 410 A.2d 1359, 1365 (1980).

¶ 28. Having decided that the HGN test is scientific in nature, we must now determine whether the reliability of the test is established or whether expert testimony is required to lay a scientific foundation for its results in every case. We begin by observing that HGN evidence has never been recognized as scientifically valid by this Court. See, e.g., State v. Alzaga, 2019 VT 75, ¶¶ 13-16, __ Vt. __, __ A.3d __ (declining to reach this question). However, we have determined that, under certain circumstances, where the admissibility of a "category of evidence . . . in particular types of cases that are recurring" is at issue, "both the trial court and this Court can fully evaluate the reliability and relevance of the evidence generally based on the decisions of other appellate courts." Kinney, 171 Vt. at 249, 762 A.2d at 841. But we may affirmatively rely upon such decisions only to the extent their evaluation of the issue is "complete and persuasive." Id. at 249, 762 A.2d at 841-42 (observing that "[w]e are not suggesting that the new standard for admissibility has somehow become general acceptance among appellate courts"). We have cautioned that "trial courts must take great care when relying on other court decisions to ensure that they do not abdicate their responsibility as evidentiary gatekeepers." State v. Forty, 2009 VT 118, ¶ 38, 187 Vt. 79, 989 A.2d 509. On appeal, this Court must apply the same rigor to its

analysis. See Kinney, 171 Vt. at 249, 762 A.2d at 841-42 ("Irrespective of the decisions of other courts, the responsibility for determining the admissibility of evidence in Vermont courts remains with our trial judges, and on appeal with this Court.").

¶ 29. We do not find the analysis of other appellate courts on this issue sufficiently "complete and persuasive" to support a conclusion about the reliability of HGN evidence. See id. Rather, our review convinces us that the reliability of the HGN test is not a settled proposition, either across jurisdictions or among the scientific community. People v. Leahy, 882 P.2d 321, 334-35 (Cal. 1994) (in bank) (declining to take judicial notice of decisions and studies concluding that HGN evidence meets the "general acceptance" standard because "the conclusions of those decisions and studies are by no means unchallenged, for there appears to exist substantial opposing authority"); State v. Witte, 836 P.2d 1110, 1121 (Kan. 1992) ("The reliability of the HGN test is not currently a settled proposition in the scientific community."). Because here, as in Forty, there is a "split of authority," an adequate evidentiary record is necessary to make an informed decision regarding the admissibility of HGN evidence in Vermont. Forty, 2009 VT 118, ¶ 39. Therefore, we join those jurisdictions which hold that HGN evidence is inadmissible absent expert testimony.[2]

¶ 30. We find no merit in the State's argument that the scientific validity of the HGN test is not at issue where it is admitted to demonstrate the reasonableness of an officer's belief that a defendant was driving under the influence. Satisfaction of the gatekeeper function "requires a binary choice" from the trial court—admit or exclude. USGen New Eng., Inc., 2004 VT 90, ¶ 26 (quotation omitted). The court's ruling here, admitting the evidence but attempting to divest it of its scientific character, did not meet that requirement and was an abuse of discretion. The fact that

_____

[2] Nothing in our decision today precludes this Court from determining, in a future case and based on an adequate evidentiary record, that the scientific validity of aspects of the HGN test is established as a matter of law and need not be supported by expert testimony. Until such time, HGN evidence is inadmissible absent expert testimony sufficient to satisfy the court's evidentiary gatekeeper function.

14

a showing of "reasonableness" is not so heavy a burden as the standard of proof required to convict a defendant of DUI beyond a reasonable doubt does not relieve the State, as the proponent of the evidence, from its burden under Rule 702.

¶ 31.   We cannot conclude that this error was harmless.   See V.R.Cr.P. 52 (defining "[h]armless [e]rror" as one "which does not affect substantial rights").  An error is harmless only where the reviewing court can find, "beyond a reasonable doubt[,] that the jury would have returned a guilty verdict regardless of the error." State v. Oscarson, 2004 VT 4, ¶ 30, 176 Vt. 176, 845 A.2d 337.  "When the alleged error is admission of evidence, it is not harmless if there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Alzaga, 2019 VT 75, ¶ 14 (quotation omitted).

¶ 32.   Here, Officer Morris testified that the HGN evidence formed the "majority" of the basis for his opinion that defendant was impaired.  Officer Morris relayed this conclusion to Officer Briggs,  who relied on it in determining that it was reasonable to request an evidentiary breath test. Indeed, in closing, the State highlighted "the eye test, which goes to the officers' collective reasonable grounds for believing that defendant had been operating under the influence."  We find more than a "reasonable possibility" that the HGN evidence may have contributed to defendant's refusal conviction.  Alzaga, 2019 VT 75, ¶ 14.  For this reason, the refusal conviction is reversed. Because we so conclude, we do not reach defendant's argument that the trial court violated Rule 605.[3]

---

[3]  Although we decline to rule on this issue, we do not condone the trial court's decision to rely on disputed evidence in a separate, undecided case then pending before it.  While, as discussed supra, ¶ 28, there are circumstances in which a trial court may assess the reliability of a category of evidence on the basis of appellate decisions from other jurisdictions, there exists no circumstance in which a trial court may assess the reliability of a category of evidence on the basis of disputed evidence aliunde.

## II. Limiting Instruction

¶ 33. Defendant argues that the court's admonishment that the jury was to consider the HGN evidence only with respect to the refusal conviction was ineffective for two reasons: because the evidence bore directly on the ultimate issue in the DUI-2 charge, and because the court did not tell the jury why it could not consider the HGN evidence with respect to the DUI-2 count. Although we acknowledge that there exists some evidence jurors cannot cast from their minds, even with the aid of a flawlessly crafted limiting instruction, we find the circumstances present here insufficient to justify departure from the important presumption that juries follow courts' instructions.

¶ 34. The State argues that defendant failed to preserve the two specific challenges to the limiting instruction she raises on appeal, and, as a result, these claims are subject only to plain-error review. Although "[c]ontentions not raised or fairly presented to the trial court are not preserved for appeal," see Lanphere v. Beede, 141 Vt. 126, 129, 446 A.2d 340, 341 (1982), "where a litigant's argument is clear enough for the trial court to evaluate it and for an opponent to respond to it, the claim is adequately preserved." State v. Mumley, 2009 VT 48, ¶ 18, 186 Vt. 52, 978 A.2d 6.

¶ 35. Here, prior to trial, defense counsel argued:

> [e]ven though the court intends to issue a limiting instruction, that will not cure the error here. And it's a significant piece of evidence in this case, I mean it's—it is a crucial piece of evidence, I think. And it will not be cured by the issuing of a limiting instruction, Your Honor.

Defendant now contends that the limiting instruction was inadequate because the evidence at issue bore directly on her guilt with respect to the DUI-2 charge, and because the court did not explain why the distinction was being made. Defendant's objection certainly preserved her concerns about the strength of the evidence in question. As to the second portion of defendant's appellate argument, "such an exacting request is not required" below. State v. Groce, 2014 VT 122, ¶ 18,

16

198 Vt. 74, 111 A.3d 1273 (holding that objection was preserved for review where, although defendant objected to testimony at trial, he did not request limiting instruction). Therefore, defendant preserved her arguments regarding the limiting instruction.

¶ 36. In the absence of evidence to the contrary, we must assume that juries follow limiting instructions as issued by trial courts. State v. Amidon, 2018 VT 99, ¶ 23, __ Vt. __, 198 A.3d 27. As United States Supreme Court has recognized, "[i]t is not unreasonable to conclude that in many . . . cases the jury can and will follow the trial judge's instructions to disregard such information." Bruton v. United States, 391 U.S. 123, 135 (1968). This "crucial assumption" is fundamental to our jury trial system; indeed, "[w]ere this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed." Parker v. Randolph, 442 U.S. 62, 73 (1979), abrogated on other grounds by Cruz v. New York, 481 U.S. 186 (1987). Therefore, we abandon the presumption only where presented with "an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987) (quotations and citations omitted); see also Bruton, 391 U.S. at 135-36 (recognizing "some contexts in which the risk that the jury will not, or cannot follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored"). Bruton found that circumstance based "on the fact that a confession that incriminates an accomplice is so 'inevitably suspect' and 'devastating' that the ordinarily sound assumption that a jury will be able to follow faithfully its instructions could not be applied." Lee v. Illinois, 476 U.S. 530, 542 (1986) (quoting Bruton, 391 U.S. at 136). This, however, is not such a context.

¶ 37. The admonition at issue here bore the hallmarks of an effective limiting instruction. It was clear and straightforward: defendant faced two charges, and the court instructed the jury

that it could consider the HGN evidence with respect to one charge, but not the other. See, e.g., State v. Smith, 2010 VT 15, ¶ 10, 187 Vt. 600, 992 A.2d 310 (mem.) (recognizing that instruction must provide "clear and specific direction to the jury"). It was also prompt and decisive, following immediately on the heels of the admission of the HGN evidence and repeated for emphasis. See, e.g., State v. Webster, 2017 VT 98, ¶ 28, 206 Vt. 178, 179 A.3d 149 (noting, with respect to curative instructions, that a "strongly worded and prompt admonition is preferred," although "the circumstances of each case must govern its merits" (quotations and brackets omitted)).

¶ 38. Defendant also argues that the instruction was substantively ineffective because it did not explain why the jury should consider the HGN results with respect to the refusal count but not the DUI-2 count. Both defendant and the dissent, post, ¶ 64, compare this case to State v. Smith, in which we found "patently inadequate" a curative instruction which "was so vague as to be pointless." 2010 VT 15, ¶ 10. However, the problem with the instruction in Smith was that the vague admonition, given several minutes after the objectional statement, failed to direct the jury to the appropriate statements, which were "multiple" and "not actually the witness's last remarks." Id. Further, "[a]ny residual value" in the limiting instruction was "undermined" when the court subsequently informed the jury that it had removed all inadmissible statements and afterward played a third recorded reference to the same prior misconduct, resulting in an implication that this later reference was "unobjectionable." Id. ¶ 11. The instruction here unquestionably directed the jury to the correct piece of evidence and made clear that it could lawfully be considered only with respect to the refusal count. [4]

---

[4] The dissent argues that the instructions to disregard the HGN testimony with respect to the DUI count but consider it with respect to the reasonableness of Officer Morris's conclusion that defendant was impaired were "fundamentally at odds," because "if the testimony makes Officer Morris's conclusion that defendant was impaired more reasonable, why wouldn't it make the jury's conclusion to the same effect more reasonable?" Post, ¶ 63. But Vermont courts routinely rely on juries to draw just such fine distinctions where instructed to do so. For example, it is well-established that, in the context of a domestic abuse prosecution, evidence of the "defendant's history of abusing the victim" is admissible to place the behavior at issue in

18

¶ 39. Defendant cites a New Jersey case for the proposition that evidence bearing "directly on the ultimate issue before the jury may be less suitable to curative or limiting instructions than evidence that is indirect and that requires additional logical linkages." State v. Herbert, 201 A.3d 691, 700 (N.J. Super. Ct. App. Div. 2019) (citing Richardson v. Marsh, 481 U.S. 200, 208 (1987)); see also Richardson, 481 U.S. at 208 (holding that "specific testimony is . . . more vivid than inferential incrimination, and hence more difficult to thrust out of mind" in response to limiting instruction). However, the New Jersey court ultimately concluded that the curative instruction at issue was ineffective "in large part because the judge's instructions missed the mark," noting that, "[i]t is one thing to assume jury compliance with a well-crafted curative or limiting instruction. It is quite another to assume compliance with an instruction that fails to clearly and sharply address the prejudicial aspect of the inadmissible evidence." Id. at 701. This holding is inapposite here, where the limiting instruction in question suffers no such deficiency. For the same reason, we discern little persuasive value in the cited proposition that instructions "can be more effective" when they explain themselves, as " '[b]ecause I said so' is likely to be even less effective from a judge to a jury than it is from a parent to an eight-year-old." Id. at 700.

¶ 40. Finally, we observe that the dissent's belief that the requirements necessary to abandon the presumption are met here is "shaped in large part," post, ¶ 52, by their contention that the State's case for intoxication was "thin," and, as a result, "the chance that the improperly admitted testimony would tip the balance is especially high," post, ¶ 57. The dissent maintains

_____

situational context for the jury, even though the jury is forbidden to consider it with respect to the defendant's propensity to abuse the victim. State v. Sanders, 168 Vt. 60, 62-63, 716 A.2d 11, 13 (1998) (holding that evidence defendant abused victim on prior occasions was admissible as tending to prove "that defendant meant to threaten and intimidate . . . when he raised the knife and said 'someone is going to die' "). We trust that juries will use such evidence only as instructed despite the fact that "[a]n especially severe possibility of prejudice exists when the crime to be introduced . . . is similar to or the same as the crime for which the defendant is accused." State v. Gardner, 139 Vt. 456, 460-61, 433 A.2d 249, 251 (1981).

that the only evidence of intoxication which was not "equivocal at best" was testimony that two officers smelled alcohol on defendant's breath, and posits that this testimony "supports an inference that [defendant] had consumed alcohol but does not itself establish impairment." Post, ¶ 57. For the four reasons that follow, and as set forth in greater detail infra, ¶¶ 46-47, we cannot agree with the dissent's view of the strength of the State's case.

¶ 41.    First, this was not a DUI case in which the defendant admitted to having consumed alcohol during the operative period, but did not concede impairment. Rather, defendant insisted throughout the police encounter and at trial on her sobriety, taking the stand to testify that, on the night in question, she was "newly sober . . . after a long stint of pretty heavy alcoholism." She attributed the odor of alcohol emanating from her person to "bad teeth" and having recently consumed fruit. In Officer Morris's substantial training and experience—which, as the dissent details, post, ¶ 59, was amply set forth to the jury—this was not a credible explanation. Second, Officer Morris's opinion of defendant's impairment was not the only one offered to the jury. Rather, Officer Briggs testified that he believed, based only on his personal observations—and separate from the opinion he held based on the officers' collective knowledge—that defendant was impaired. Notably, Officer Briggs also explicitly testified that he was not in a position to observe the results of the eye test. Therefore, the jury could also consider that—absent any ability to smell, and untainted by any consideration of the HGN test results—Officer Briggs believed defendant was impaired. Third, as to defendant's behavior, which the State argued was indicative of impairment, we cannot agree with the dissent that "the jury could infer from the evidence that defendant interacted appropriately throughout the evening with the other officers," and that defendant's behavior was "escalated" only toward Officer Brewer. Post, ¶ 57. After Officer Brewer's involvement in the encounter ended, defendant directed a profane gesture, which we have previously characterized as one of "arrant disdain," see Webster, 2017 VT 98, ¶ 4, at Officer Morris in response to his request for an evidentiary sample of her breath. We respectfully suggest

20

that this behavior—which defendant herself testified to—stands at odds with an inference of appropriate interaction. Finally, because the State played a video of defendant's interactions with Officers Brewer and Briggs in the municipal parking lot and explained it was "offered to demonstrate [her] impairment or lack thereof," we also disagree that the State had to establish impairment "based solely on the officers' observations of defendant." Post, ¶ 58.

¶ 42. Intoxication was the only contested element of the DUI-2 charge, and the State needed to prove only that defendant had lost, in some appreciable measure, control of her mental and physical faculties. State v. Carmody, 140 Vt. 631, 638, 442 A.2d 1292, 1295 (1982) ("To support a claim of 'under the influence' requires observable behavior indicating a loss of full control over the faculties of mind and body . . . . With this a witnessed fact, the measure of that loss is not material, and the violation of that portion of the statute is sufficiently established."). The evidence the State offered on this narrow point was neither as equivocal nor as dependent on Officer Morris's opinion as the dissent contends. For this reason, we cannot agree that there is a "strong likelihood" that the evidence subject to the limiting instruction would be "devastating" to defendant, and do not abandon the presumption. See Greer, 483 U.S. at 766 n.8 (quotation omitted).

¶ 43. Having no cause to depart from the presumption that the jury followed the trial court's limiting instruction, we hold that the court's error in admitting the HGN evidence was harmless as to the DUI-2 charge because we must assume that the jury followed the court's limiting instruction.

### III. Admission of PBT

¶ 44. Finally, we turn to the question of whether the court erred in admitting the PBT refusal as probative of defendant's consciousness of guilt to DUI. Section 1203(f) of Title 23 prohibits use of "[t]he results" of a PBT in any court proceeding except "for the purpose of deciding whether an arrest should be made and whether to request an evidentiary test." Defendant

21

contends that the word "results," as used in the statute, encompasses a driver's refusal to take a PBT, and, therefore, the court's admission of this evidence violated § 1203(f). She also argues that, before admitting the PBT-refusal evidence as relevant to consciousness of guilt, the court was required to perform a more rigorous analysis to determine whether a chain of interlocking inferences supported the conclusion that the refusal was probative of consciousness of guilt. See State v. Scales, 2017 VT 6, ¶ 8, 204 Vt. 137, 164 A.3d 652. Lastly, she contends that she had a constitutional right to refuse the PBT, and that admitting evidence of the refusal penalized her exercise of that right and was unfairly prejudicial. We conclude that we need not determine whether evidence of defendant's refusal should have been excluded under any of these theories because, assuming arguendo that the PBT-refusal evidence was admitted in error, the error was harmless beyond a reasonable doubt. Oscarson, 2004 VT 4, ¶ 30.

¶ 45. Here, again, we consider whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. Alzaga, 2019 VT 75, ¶ 14. In making this determination, we consider "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." Oscarson, 2004 VT 4, ¶ 32 (quotation omitted). Apart from the prejudicial effect of the offending evidence, the most important factor is the strength of the prosecution's case absent the offending evidence. Smith, 2010 VT 15, ¶ 12.

¶ 46. The only element of the DUI-2 charge that defendant contested at trial was intoxication. Under 23 V.S.A. § 1201(a)(2), to prove intoxication, "the State need only prove that defendant had lost full control over the faculties of mind and body due to the effect of intoxicating liquor; the measure of that loss is immaterial." Gray, 150 Vt. at 193; 552 A.2d at 1196. Absent testimony regarding the PBT refusal and HGN test result, the State offered ample evidence upon

22

which the jury could conclude that defendant had lost full control over her faculties of mind and body due to the effect of intoxicating liquor. Both officers who were able to smell on the night of defendant's arrest detected the odor of alcohol coming from her breath; when defendant exhaled directly at Officer Morris, that odor was "very, very strong." When confronted with this information, defendant offered an explanation which Officer Morris found incredible. Defendant's eyes were bloodshot and watery, although the weight of this evidence was diminished by testimony that she had been crying. Defendant displayed belligerent, confrontational behavior, as described by the officers and depicted in media played for the jury. Defendant swayed as she stood during the administration of field sobriety tests, and, during the walk-and-turn, she stepped off the spot where she was directed to stand. She skipped a number when instructed to count out loud. Defendant's performance on the tests was "slow and deliberate." Based on his substantial training and experience, Officer Morris testified that this, too, was an indicator of impairment. Finally, when asked to provide an evidentiary sample of her breath, defendant refused to do so, instead directing a crude hand gesture toward the officer.

¶ 47. We turn first to the two most important factors, the strength of the State's case absent the offending evidence and the prejudicial effect of the evidence complained of. See Smith, 2010 VT 15, ¶ 12. On the basis of the evidence set forth above, the State had a strong case that defendant had, in some measure, lost full control over her faculties of mind and body. See Gray, 150 Vt. at 193; 552 A.2d at 1196. Nor was the evidence of the PBT refusal particularly prejudicial. While it was not exactly "cumulative" to testimony regarding the evidentiary test refusal, the two pieces of evidence are very similar in implication. See Oscarson, 2004 VT 4, ¶ 32. We can reasonably conclude that the jury's consideration of defendant's refusal of the evidentiary test—and her vehement expression of that refusal—largely eclipsed any impact of the PBT refusal.

¶ 48. Further, in its closing argument, the State highlighted the fact that the jury could consider defendant's refusal to take an evidentiary breath test as evidence on the DUI-2 count,

while minimizing the PBT as "just a preliminary test," the result of which would not have been admissible in evidence. The court then specifically instructed the jury that defendant's refusal to provide an evidentiary test could be used to determine whether the State met its burden of proving that defendant was driving under the influence. In addition, the State's theory that defendant's refusal to take the PBT was motivated by consciousness of guilt was not the only one before the jury. See Oscarson, 2004 VT 4, ¶ 32 (noting that we consider the presence of evidence contradicting the objectional evidence in harmless-error analysis). Rather, defendant herself testified that she refused the PBT because she preferred a blood test based on concerns about the PBT's accuracy.

¶ 49. For these reasons, we conclude that admission of the PBT refusal evidence was harmless beyond a reasonable doubt.

Reversed and remanded as to refusal, affirmed as to DUI-2.

FOR THE COURT:

_____
Associate Justice

¶ 50. **ROBINSON, J., concurring in part, dissenting in part.** I join in the majority's thoughtful analysis of the state of our law concerning the admissibility of horizontal gaze nystagmus (HGN) evidence without expert testimony to establish the link between observed eye movements and an inference of impairment, and accordingly concur in the majority's reversal of defendant's conviction for refusing to submit to an evidentiary breath test. However, I cannot join the majority's conclusion that the court's instruction to the jury to ignore the offending testimony was sufficient to avoid impermissibly compromising defendant's fundamental rights. For that reason, I would reverse defendant's conviction for driving under the influence notwithstanding the

trial court's cautionary instruction, and accordingly dissent from the majority's affirmance of the DUI-2 conviction.

¶ 51. As the majority acknowledges, "[w]e normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." Greer v. Miller, 483 U.S. 756, 766, n.8 (1987) (quotations and citation omitted). See ante, ¶ 36. For several reasons, I believe that in this case there is such an overwhelming probability that the jury did consider the improperly admitted evidence, notwithstanding the court's instruction to the jury. First, the State's case here was thin, making the marginal impact of the HGN testimony more potentially impactful. Second, the inadmissible testimony provided critical evidence of impairment that was central to the State's case, and served as the foundation for testimony by Officer Morris that was cloaked with an unsubstantiated veneer of scientific validity. Third, in contrast to the typical case in which a trial court instructs a jury to altogether ignore testimony it should not have heard, in this case the court affirmatively authorized the jury to consider the evidence for a related purpose, suggesting that the evidence was, in fact, probative with respect to the likelihood of defendant's intoxication. Finally, I do not believe the court's instruction to the jury to ignore the HGN testimony for purposes of the DUI charge was sufficient to inform the jury that it should not consider Officer Morrison's opinion that defendant was impaired in considering the DUI charge. I elaborate on each consideration below.

¶ 52. First, my view is shaped in large part by the fact that this was a close case. The State presented sufficient evidence that defendant was driving under the influence to support a conviction on that charge, but a conviction was by no means a foregone conclusion. In connection with its harmless-error analysis addressing the trial court's admission of the PBT refusal evidence, the majority has accurately identified evidence the jury could properly consider to support its

25

determination that defendant was under the influence: two officers smelled alcohol on her breath, she was belligerent at times, she stepped off the spot where she was directed to stand during a walk-and-turn test, she skipped the number twelve when counting seconds out loud, and she was "slow and deliberate" in performing the field sobriety tests. See ante, ¶ 46.

¶ 53. But there was a great deal of evidence that could have led the jury to conclude that the State did not meet its burden of proving impairment beyond a reasonable doubt. Officer Briggs drove behind defendant for about a mile before she made a left turn into the municipal parking lot, where she parked. She did not speed or weave over the center line or fog line, and properly used her blinker when turning left; Officer Briggs saw no evidence of impaired driving. Officer Brewer watched defendant for about thirty seconds as she drove past the police station. He likewise did not observe any signs of impaired driving.

¶ 54. Officer Briggs made contact with defendant at the municipal parking lot. Before Officer Brewer arrived, defendant was cordial with Officer Briggs; in fact, she remained cordial with him even after Officer Brewer arrived and she began arguing with him. Defendant got out of her car shortly after Officer Briggs made contact with her, and talked with him for a couple of minutes before Officer Brewer arrived. Based on his interactions with her and observations to this point, Officer Briggs did not believe that defendant was under the influence, and did not think it was necessary to ask defendant to perform field sobriety exercises. In fact, even as he transported her to the station to process her citation for driving with a suspended license—after he observed her arguing with Officer Brewer—and even after he completed the citation for driving with a suspended license, Officer Briggs did not think she was under the influence of alcohol. At the police station, defendant accepted a citation for the suspended license. She was crying, but was cordial and polite.

¶ 55. Although defendant was belligerent at the municipal lot, Officer Briggs and Officer Brewer both testified that defendant became belligerent only with Officer Brewer. Officer Briggs

26

described defendant as "agitated" by Officer Brewer's presence. Defendant testified that as soon as he arrived, Officer Brewer, "directly and kind of hostilely" asked her how much she had been drinking—a question that caused her to feel accused. She explained that she was upset with Officer Brewer as a result of a prior encounter, and that he was very hostile with her. She said that when people are aggressive with her, or she dislikes them or is angry with them, she behaves the way she acted with Officer Brewer. Officer Brewer himself testified that he thought defendant was upset by his presence based on a prior encounter he had with her. Only after defendant began to argue with Officer Brewer and he responded by placing her in handcuffs did he assert that he smelled alcohol on her breath. Even so, Officer Brewer conceded that based upon the limited time he spent with defendant, he was not able to develop an opinion as to the extent of her impairment, if any.

¶ 56.  At the police station, after Officer Briggs issued her a citation for driving with a suspended license, Officer Morris arrived and asked defendant to perform field sobriety exercises. He testified that he smelled alcohol on her breath. Of the potential clues the officer was looking for on the walk-and-turn exercise, he observed only one: defendant swayed while he was giving her instructions about the exercise. Officer Morris acknowledged that defendant did not start before she was instructed to, properly touched heel to toe as instructed, did not improperly use her arms for balance, took the correct number of steps, and completed the exercise. The only clue suggesting intoxication in connection with this exercise was defendant's swaying during the instructions. Similarly, on the one-leg stand, Officer Morris acknowledged that he did not observe any clues of intoxication. In particular, she did not sway while balancing, was able to balance on one leg, did not use her arms to balance, did not hop, and did not put her foot down during the thirty-second period while she stood and counted. (Officer Morris did note one "indicator"—as opposed to "clue"—during this test: in counting one-one-thousand, two-one-thousand, etc., defendant skipped from eleven to thirteen.) Officer Morris testified that defendant was upset and

27

crying when he encountered her in the processing room and that she told him she was experiencing some anxiety at the time.

¶ 57. I detail the above evidence because I take issue with the majority's characterization of the State's case as strong. See ante, ¶ 47. The two officers who actually saw defendant driving observed no signs of impairment in the way she drove. Other than testimony that two officers smelled alcohol on her breath—testimony that supports an inference that she had consumed alcohol but does not itself establish impairment—the evidence relied upon by the State is equivocal at best. The State makes much of her behavior, but the jury could infer from the evidence that defendant interacted appropriately throughout the evening with the other officers, and that Officer Brewer's provocative conduct escalated defendant's anger for reasons having nothing to do with her being intoxicated. Evidence that she had bloodshot eyes has minimal value in the face of testimony by multiple witnesses that she was crying during the extended encounter. And defendant's performance on the physical field sobriety exercises, while not perfect, was also fully consistent with sobriety. In the face of such a thin case, the chance that the improperly admitted testimony would tip the balance is especially high.

¶ 58. Second, the evidence was not peripheral to the central issue in the case; rather it went to the heart of the State's case. And the limiting instruction did not fully address the impact of the evidence. The issue in this case was whether defendant was impaired by alcohol. We have no evidence of defendant's blood alcohol level, and no evidence that her driving actually demonstrated impairment. In order to secure a conviction, the State had to establish beyond a reasonable doubt, based solely on the officers' observations of defendant, that she was impaired. As noted above, the admissible evidence concerning impairment was mixed. A jury could easily have concluded that the State failed to meet its burden, especially if it concluded that defendant's agitated behavior was a reflection of her personality and the circumstances, and not necessarily a sign of intoxication. In this context, the HGN testimony that the jury was invited to hear and

28

accept bolstered the State's case by directly supporting an inference—and the testifying officer's purportedly expert opinion—that defendant was impaired.

¶ 59. The context of the testimony matters. The trial court permitted the State to essentially establish that Officer Morris, who testified about his HGN observations, was an expert in interpreting field sobriety exercises, and in evaluating the impact of alcohol on the body. Officer Morris testified extensively about his qualifications. He testified that on two different occasions, in 2005 and again in 2013, he went through a forty-hour training program on DUI enforcement and DUI processing, including administration of standard field-sobriety exams. In addition, he took a two-day, sixteen-hour course called Advanced Roadside Impaired Driving Enforcement, reinforcing his training concerning standard field-sobriety testing and also teaching him what to look for in administering the field sobriety exercises with respect to drugs. He testified that after a two-week, eighty-hour intensive course, and another week in Arizona for evaluations using a dozen real subjects, he was certified as a drug recognition expert. He explained that this course included studying the physical effects of different categories of drugs, including alcohol, on the body, and interpreting the use of these different drugs in the context of an evaluation. In order to be certified, he had to and did achieve a certain level of proficiency. Officer Morris testified that all of this study centered around the standard field sobriety tests and the effects of drugs and alcohol.

¶ 60. Officer Morris then testified extensively about the structure and purpose of the "standard field sobriety test," and his administration of the exercises here. He testified that the first field sobriety exam he conducted with defendant involved "looking at her eyes." He said he administered this exam consistent with his training and experience at the academy and in the advanced class and affirmed that what he observed "can . . . be associated with impairment by

29

alcohol."[5] After reviewing the other field sobriety exercises that he administered—the walk-and-turn and the one-leg-stand tests—he testified to administering some other unidentified exams. Based on all of this evidence, Officer Morris reached a conclusion that defendant was "impaired moderately to severely." The court did not at that point instruct the jury not to consider Officer Morris's opinion that defendant was impaired in connection with the DUI charge, even though that opinion rested predominantly on HGN testimony that the jury was instructed not to consider for that purpose.

¶ 61. In response to cross examination, Officer Morris elaborated on his training in evaluating the significance of eye movements in detecting alcohol impairment, and reiterated his assertion that he observed that defendant had eye movements that can be associated with alcohol impairment. When asked whether he based his conclusion that defendant was impaired almost entirely on the eye test he administered, Officer Morris said "we can go with the word 'majority.' "

¶ 62. In sum, the jury was permitted to hear testimony suggesting that Officer Morris had extensive training evaluating eye movements in the HGN test to determine whether a suspect is impaired, and was permitted to hear him opine—based predominantly on his observations in administering the HGN test—that defendant was impaired.[6] Impairment was the only contested issue in connection with the DUI charge; although the determination of impairment was for the jury to make, testimony of a purported expert in assessing the same evidence available to the jury that the evidence showed that defendant was impaired was potentially devastating to defendant's case—notwithstanding the court's instruction that the jury should not consider the HGN testimony

---

[5] At this juncture, the court instructed the jury that with respect to the movement Officer Morris saw in defendant's eyes, "you are to look at that only with respect to the reasonableness of his request for an evidentiary test. You are not to take it with respect to impairment."

[6] The State amplified this testimony in its closing, emphasizing that Officer Morris, as a highly trained drug recognition expert, had concluded that defendant's level of impairment was moderate to severe.

itself for the purposes of the DUI charge. Significantly, the court never instructed the jury that it should not only disregard the HGN evidence for purposes of the DUI charge but should also disregard Officer Morris's opinion testimony—which rested primarily on that evidence—in connection with that charge. In this context, the inadmissible testimony provided the State with the critical evidence to establish that defendant was impaired and served as the foundation for the purportedly expert opinion testimony the jury heard on the ultimate question in connection with the DUI charge.

¶ 63. Third, and a corollary to the above considerations, the court's instruction in this case sent the jury irreconcilable mixed messages. This is not a case in which the court instructed the jury to disregard testimony that it should not have heard. See, e.g., State v. Messier, 2005 VT 98, ¶¶ 18-21, 178 Vt. 412, 885 A.2d 1193 (holding that trial court did not abuse its discretion in denying mistrial where, following each of two different inadmissible statements, trial court immediately gave curative instructions directing jury to disregard statements). Nor is it a case in which the court admitted evidence for a limited purpose but cautioned the jury not to consider the evidence for a functionally different and improper purpose. See, e.g., State v. Amidon, 2018 VT 99, ¶¶ 22-23, __ Vt. __, 198 A.3d 27 (affirming where court admitted evidence of defendant's incarceration and release to help explain why victim suddenly became frightened of defendant, but instructed jury that they should not consider fact of incarceration as evidence of defendant's character or that he committed offense for which he was on trial); State v. Kelley, 2016 VT 58, ¶ 40, 202 Vt. 174, 148 A.3d 191 (noting that court properly used curative instruction to alleviate risk that jury would consider evidence of out of court statements used to impeach witness's trial testimony for truth of those statements). Here, the court expressly allowed the State to use the HGN testimony to support Officer Morris's conclusion that defendant was impaired, but then asked the jury not to consider the testimony in determining whether defendant was impaired. From the jury's perspective, especially without further explanation, those two instructions were

fundamentally at odds: if the testimony makes Officer Morris's conclusion that defendant was impaired more reasonable, why wouldn't it make the jury's conclusion to the same effect more reasonable? There is a fundamental tension in the instructions the court gave the jury. As the Court holds today, the HGN testimony was not admissible in connection with <u>either</u> charge. The fact that the trial court suggested that it was admissible in connection with one charge but not the other sent irreconcilable mixed messages to the jury as to the reliability and probative value of the testimony.

¶ 64. Even if a jury could be expected to follow an instruction allowing it to consider the HGN testimony for purposes of assessing the reasonableness of Officer Morris's conclusion that defendant was impaired in the context of the refusal charge, but not for the purposes of making its own determination as to whether defendant was impaired in the context of the DUI charge, I am not convinced that the instruction was sufficiently clear to accomplish this. Before Officer Morris testified about his observations of defendant's eyes when administering the HGN assessment, the court advised the jury:

> With respect to the movement he saw in the eyes, you are to look at that only with respect to the reasonableness of his request for an evidentiary test. You are not to take it with respect to impairment. Okay? So there are two parts of the case. And you can only look at it with respect to the reasonableness of the request, not with respect to impairment.

The court did not issue any further instructions, and allowed Officer Morris to offer an opinion on the ultimate question of impairment. Even assuming that the jury understood at the time of the court's instruction that the court meant it could consider the evidence in the context of the refusal charge, but not in the context of the DUI charge—a link the court did not make in its instruction— it is not at all clear whether the court's instruction concerning "the movement he saw in the eyes" extended to the opinion offered by Officer Morris based primarily on that movement. Given the lack of clarity on this point, and the very real likelihood that the jury, believing itself to be adhering

32

to the court's instruction, declined to draw its own direct inferences from the HGN testimony but nonetheless relied on Officer Morris's opinion, I do not believe the curative instruction here accomplished its objective. See State v. Smith, 2010 VT 15, ¶ 10, 187 Vt. 600, 992 A.2d 310 (holding that curative instruction did not cure improper admission of prejudicial evidence where instruction provided no clear and specific direction to jury).

¶ 65. For these reasons, I conclude that the court's limiting instruction in this case was not sufficient to protect defendant from the prejudicial impact of the inadmissible testimony concerning the HGN test. I would reverse the DUI conviction.[7]

¶ 66. I am hereby authorized to state that Justice Skoglund joins this concurrence and dissent.

 

 

 

_____

Associate Justice

---

[7] Because I would reverse the DUI conviction on this basis, I do not address the majority's contention that any error in admitting the PBT refusal evidence was harmless. I do not join in the majority's analysis on this point.