NOTICE
Decision filed 06/04/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 210427-U

NO. 5-21-0427

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Bond County. |
| | ) | |
| v. | ) | No. 20-CF-124 |
| | ) | |
| JOHNATHON C. MAZUR, | ) | Honorable |
| | ) | Christopher J.T. Bauer, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justices Boie and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The defendant's convictions for four counts of predatory criminal sexual assault and four counts of criminal sexual assault are affirmed where his counsel forfeited his argument that his due process rights were violated because the jury was unable to hear the entirety of the testimony presented during his trial, and the defendant's argument was not subject to plain-error review. Also, his counsel was not ineffective for failing to preserve this issue for appeal and for failing to seek remedial measures after the jury indicated difficulty hearing certain witness testimony because he was not prejudiced by counsel's inaction.

¶ 2    The defendant, Johnathon Mazur, appeals his conviction for four counts of predatory criminal sexual assault and four counts of criminal sexual assault. On appeal, the defendant contends that his due process rights were violated because the jury was unable to hear the entirety of the testimony presented during his trial. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      On October 21, 2020, the State charged the defendant with multiple counts of both predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) and criminal sexual assault (*id.* § 11-1.20) based on sexual acts committed against H.R. The November 2021 trial took place during the COVID-19 global pandemic, and safety protocols were implemented during the jury trial to protect against contracting or spreading the virus, which included assigned seating for the jury to maintain social distancing. At trial, the following evidence was presented.

¶ 5      H.R., who was 14 years old at the time of the trial, testified about the circumstances surrounding the allegations against the defendant. After the first few questions, the State noted that H.R. was "really soft-spoken," asked her to "scream" for them, and asked the jurors if they could hear her. After the jurors in the far corners all indicated that they could hear, the State continued with the questioning. At the time of the incidents in question, H.R. lived with her mother, and the defendant, who was her mother's boyfriend, also lived with them. H.R. was approximately six or seven years old when the defendant moved in with them.

¶ 6      H.R. explained that her relationship with the defendant changed when she was in the fifth grade. She noted that the relationship change was sexual, and when asked to explain what she meant, she responded, "[l]ike vagina and penis." She did not remember how it started but noted that he "touch up[ed]" on her and then it became sexual. She explained that they started secretly vaping together, and then, the vaping led to the defendant making comments to her and "sexual stuff." She was testifying that the defendant made comments to her after she showered when the State interrupted to let her know that the jury could not hear her. She then continued and indicated that the defendant went into the bathroom while she was showering and either watched her or made

2

comments about her body type or about how good she looked. She was approximately 10 or 11 years old at the time.

¶ 7    H.R. testified that these comments led to "sexual things." Her mother was never around because she was a hoarder and was always shopping, but her sister and brother were usually home during the incidents. She indicated that the defendant "touch[ed] up" on her "here and there." He touched her while she was sleeping; she explained that she woke up to him "touching up" on her or "fingering her" by touching her vagina or inserting his finger inside her vagina. She added that he also touched her vagina with his penis or inserted one of her mother's vibrators in her vagina. She also indicated that she did "69" with him in the shower, meaning that the defendant's penis was inside her mouth while the defendant placed his mouth on her vagina; they had "missionary" sexual intercourse multiple times on a pile of clothes in the basement; and they had intercourse in her mother and the defendant's room, the living room, her bedroom, the playroom, and her mother's vehicle. She noted that her mother and the defendant used methamphetamine, and the defendant had given her methamphetamine in his vape.

¶ 8    H.R. testified that the defendant claimed that she was his stress relief because he worked outside and was sleep deprived. He called her a "sack of potatoes" when she did not arouse him. The sexual acts became more frequent as her mother was out of the house more; at one point, the sexual acts were occurring at least once or twice per week. She was explaining that she knew when the defendant "wanted it" when the court reporter requested that she speak louder. H.R. then indicated that she would just "do it" because she knew what he wanted. The State then urged her to keep her voice up.

¶ 9    From November 2019 until October 2, 2020, the longest time frame that they did not have sexual intercourse was approximately two weeks. H.R. noted that they had "anal sex" often

because the defendant did not have condoms; she explained that he used baby oil for lubricant, but it still hurt. At this point, the State again asked H.R. to speak up. She believed that she had anal sex with the defendant at least one time between July 27, 2019, until her thirteenth birthday. She estimated that, from July 2019 until her thirteenth birthday, they had vaginal sex at least 80 times. She also noted that the defendant placed his penis in her mouth, his mouth on her vagina, and his finger in her vagina at least one time during that time period. After her thirteenth birthday, the defendant placed his penis inside her vagina, his penis in her mouth, his mouth on her vagina, and his finger in her vagina at least one time. She noted that it was fair to say that those sex acts happened all the time. She was again asked to speak up at this point. She was expected to perform sexual acts on the defendant so she could see her boyfriend or if she wanted to go somewhere. The defendant also punished her by taking away her Wi-Fi access if she did not have sex with him or perform oral sex on him. She described one incident where he threw the Wi-Fi box outside after she refused to have sex with him. During this testimony, she was asked several times to repeat herself because it was difficult to hear her. She described another incident where he got mad after she refused to have sex with him, and he threw knives or a machete into the wall.

¶ 10    H.R. testified that no one ever witnessed the sexual acts between her and the defendant. However, she witnessed the defendant and her sister, who was also living in the house, having sex. H.R. eventually told her boyfriend about what the defendant was doing to her, and her boyfriend's family talked with her about it and took her to the police station. She then went to live with her father.

¶ 11    At the end of direct examination, the trial court addressed the fact that it was hard to hear H.R.'s testimony because she spoke quietly and quickly, and after asking for a show of hands who also had difficulty hearing her, learned that four jurors and one alternate juror believed that there

4

were answers that they did not hear. The court then specifically asked two jurors who did not raise their hands (presumably the two who were further away) if they heard the testimony, and they responded that they did. The court then urged H.R. to slow down and speak up. After a sidebar with counsel, the court asked the jurors who had expressed difficulty hearing which of them believed that they heard more than 90% of the testimony, and four of them raised their hands. The remaining juror indicated that she had heard about 75% of the testimony. The State then indicated that it could probably address the issue on redirect. The defendant's counsel then proceeded with cross-examination.

¶ 12    During cross-examination, the trial court asked the jurors to raise their hands if they could not hear a response from H.R. H.R. then testified that her mother and the defendant stopped having sex once her brother was born. H.R. observed the defendant "touch up" on and having sex with her sister. Her sister was always at home when the sexual activities between her and the defendant occurred. H.R.'s mother usually was not home during the incidents. H.R. indicated that the majority of the time, she and her sister did not get along. She noted that she was the mean one and would get her sister, who was the "good one," in trouble. She also noted that her mother was mean and stressed her out. She acknowledged never telling her mother or sister what the defendant was doing to her.

¶ 13    On redirect examination, the trial court informed the jury that the State might be covering issues that were already addressed on direct examination because some of the jurors had not heard portions of H.R.'s testimony. Also, before questioning H.R., the State urged her to speak louder since some jurors were unable to hear before. Then, the State again elicited testimony from H.R. about the types of sexual contact she had with the defendant and when the contact took place. At some point during this testimony, the trial court indicated that some of the jurors were signaling

5

that they could not hear H.R. and had her repeat what she said. She reiterated that the sexual contact she described happened both before and after her thirteenth birthday. She indicated that when she was younger, she was close to the defendant and that she did not tell anyone what the defendant was doing to her because "they were still family" to her.

¶ 14 After H.R. was excused, a juror asked for H.R.'s answer to the question about why she did not tell anyone about the abuse to be repeated. Neither the State nor the defendant's counsel objected to the court reporter merely reading back the response to that question. Thus, the question and H.R.'s answer were both read to the jury.

¶ 15 The parties stipulated that the defendant was 38 years old at the time of the trial; that the defendant, H.R.'s mother, and the children moved into a residence in Pocahontas, Illinois, on July 13, 2019; and that the defendant continuously resided there with them until H.R. was removed on October 2, 2020.

¶ 16 Before T.L. testified, the State urged him to speak up so that all of the jurors could hear him. The trial court also told the jurors not to hesitate to raise their hands if they had difficulty hearing the testimony. T.L. was 15 years old; he dated H.R. for almost one year, beginning on June 2, 2020; and he met her at school when they were in the seventh grade. At one point during the testimony, a juror missed part of T.L.'s answer, so T.L. was asked to repeat it. The trial court also asked him to speak slower. During the summer, H.R. went to his house approximately once or twice per week, depending on whether she was permitted to leave the house or had things to do. He only went to her house once. They would also FaceTime about three or four times a week, usually at night.

¶ 17 T.L. testified that he found out about the sexual activity between the defendant and H.R. during a FaceTime call between him and H.R. in July 2020. During the call, H.R. began arguing

with the defendant, and T.L. heard loud noises from things being thrown at the walls. At this point, the trial court and the State urged him to talk slower and louder. T.L. explained that the defendant kept opening and closing H.R.'s door, and he heard loud noises, so he asked H.R. what was wrong. T.L. could not hear what was being said because H.R. kept muting herself. However, H.R. responded with a hand gesture that indicated sex and explained that the defendant was angry because she would not have sex with him, so he started throwing knives at the wall. Before this, T.L. did not know about the sexual activities between the defendant and H.R. H.R. also showed him the holes the defendant made in the walls.

¶ 18    Approximately one week later, T.L. saw H.R. in person, and they had a conversation about the FaceTime call. During their conversation, she told him that the sexual abuse began when she lived in Highland; he thought she was in the fifth grade when it started. She explained that she was lying down one night when the defendant came up to her and "just stuck his dick inside of her," but he then took it out really quickly and walked away. She also indicated that it was still occurring. That evening, H.R.'s mother, the defendant, and her younger brother picked her up from T.L.'s house. Before they left, T.L. saw the defendant and H.R. wrestling in his yard, and he could tell something was wrong by the way the defendant had her pinned down and how the defendant was sitting on her. The interaction made him uncomfortable.

¶ 19    On October 2, 2020, T.L. told his stepmother about H.R.'s allegations, and his stepmother got the police and his grandmother involved. He explained that he told his stepmother because someone needed to know about what was happening so something could be done about it.

¶ 20    During cross-examination, one juror noted difficulty hearing an answer to a question, so the trial court repeated the question and answer and asked T.L. to speak slower. T.L. acknowledged that, on the FaceTime call, he never heard the defendant ask H.R. for sex and never heard the

7

defendant throwing objects at the walls. H.R. muted herself approximately three to four times while they were on FaceTime. He acknowledged that he was not there, so he did not know exactly what was going on in the background and had to rely on what H.R. told him.

¶ 21    On redirect examination, T.L. clarified that, although H.R. had muted the FaceTime call, it was obvious that she was having a heated conversation with the defendant. He described the wrestling that he witnessed between the defendant and H.R. as disgusting, inappropriate, and not something that an older person should be doing with a child.

¶ 22    M.L., T.L.'s father, testified that H.R. was at his house fairly often, even staying overnight on occasions when no one picked her up. He observed that H.R. was really quiet and distant, and she would never sit next to him at the dinner table. There were a few times when he sat next to her, and she changed seats. He also noticed that H.R. was extremely sexual for a 13-year-old girl and always had to be really close to T.L. Their behavior made him uncomfortable because "everything that they did together was more of a sexual way," so he separated them for a bit and had a talk with both of them.

¶ 23    M.L. testified that the defendant came to his house one night with H.R.'s mother to pick up H.R. The defendant stayed in the front yard and would not come up on the porch with H.R.'s mother to talk to him. When H.R. came outside, she and the defendant began play fighting. At first M.L. thought it was no big deal, but then at one point, the defendant pushed H.R. to the ground and laid on top of her, straddling her "crotch to crotch," while holding her arms down. H.R. asked the defendant multiple times to get off her, but he had her pinned down for approximately 15 to 20 minutes. M.L. described the interaction as extremely disturbing and sexual and noted that they were in the "missionary position." M.L. and Kylie, his fiancée, both felt like something was not right with the interaction, and they called Kylie's mother to see what she thought was going on

8

with the situation. Kylie's mother had approximately 25 to 30 years' experience with foster children who had dealt with rape and abuse.

¶ 24 After the incident and after talking with Kylie's mother, M.L. was concerned about H.R.'s welfare, and he and Kylie spoke with T.L. to see if T.L. could get any information from H.R. about her relationship with the defendant. T.L. later told them about what H.R. had disclosed to him. H.R. was at their house that day, so they took her to the sheriff's department. H.R. then moved in with her father.

¶ 25 At the start of the second day of the trial, the trial court reminded the jurors to raise their hands if they had any difficulty hearing the witness testimony. Then, B.D. testified that the defendant dated her mother for about 2 years when she was approximately 15 or 16 years old; he lived with them for a little over 1 year. During that time, the defendant made her uncomfortable several times. Initially, he just made small comments about her appearance, such as telling her that he could see down her shirt in the mirror and that he would look out the window and see her tanning in their yard. Then, one time, she woke up to him with his head between her legs, licking her vagina. He also touched her on other occasions; she estimated that he touched her five times. There was also another time that she woke up to him with his hand in her pants; she noted that his hand was under her pants, and his fingers were touching her vagina. She noted that these incidents took place approximately 10 years ago. The defendant gave her marijuana whenever she wanted it, and they also smoked marijuana together. She noted that they were really good friends until "all [the] weird stuff started happening."

¶ 26 Cara Christanell, a certified pediatric nurse practitioner who worked in the child protection division at Cardinal Glennon Children's Medical Center, testified that, on October 29, 2020, she met with H.R. and conducted a complete physical examination. The examination occurred about

one month after H.R.'s last sexual encounter with the defendant. During the examination, H.R. expressed concerns about being pregnant and contracting a sexually transmitted infection. H.R. exhibited signs of depression; expressed that she had difficulty sleeping; and reported that she had cut herself, which happened a lot with abuse victims, and had attempted suicide in the past. Christanell noted that H.R.'s physical examination was normal, which was typical of sexual abuse victims. A normal examination did not rule out sexual abuse because little physical injuries could heal quickly, and permanent injury or scarring was rare.

¶ 27    Patricia Radcliffe, a therapist who worked at the Madison County Child Advocacy Center, testified as an expert in the area of child development and a child's response to sexual abuse. Radcliffe testified that she never met H.R. or her siblings. Radcliffe explained that when children talked about sexual abuse using extremely graphic or vulgar language, it was language typically learned from the perpetrator. Radcliffe also explained that the majority of cases did not involve physical aggression and that the majority of children who disclosed sexual abuse knew their perpetrator and were close to the person in some way. Thus, sexual abuse was difficult to prove due to lack of physical evidence or physical injury. Radcliffe noted that the injury and damage was usually psychological.

¶ 28    Radcliffe also talked about how some sexual assault victims developed dissociation where they were not mentally present during the incidents in order to protect themselves from the harm being done to them. Thus, these children might have blocks of time that could not be remembered, or they might be unable to recall details of what happened. She noted that, when these children spoke about their abuse, it might appear as if the whole story was not told.

¶ 29    Radcliffe explained that the method by which sexual predators gained access to children could be so subtle and manipulative that the children never realized what was happening. She

noted that, for example, the predator might establish alone time with the child, such as by taking them places or providing them rides somewhere, and slowly introduce rewards and gifts while also introducing sexualized content. She further noted that the sexualized content might start as talk or an inadvertent touch and then progress to more blatant or overt sexual touch. She explained that the predator would find ways to meet the child's needs to develop and establish a relationship. She also explained that children who did not have consistency and stability in their lives were more vulnerable because they sought caring relationships.

¶ 30    Radcliffe testified that the majority of sexual abuse victims did not report the abuse because they were humiliated and ashamed and, once they reported the abuse, they knew their world would change. For the victims who did disclose the abuse, the exact timelines of disclosure varied greatly from person to person.

¶ 31    Before M.R., H.R.'s sister, testified, the trial court asked her to speak loudly and to project her voice so everyone could hear her. M.R. then testified that she lived with her mother, H.R., and the defendant at the time in question. She had known the defendant since she was in the second grade. She spent a lot of time at home, and her mother, who was a stay-at-home mother, was also at home the majority of the time. During the time that she lived there, she never witnessed any sexual behavior between H.R. and the defendant. She also indicated that the defendant never tried anything sexually with her.

¶ 32    On cross-examination, M.R. acknowledged that she loved the defendant and talked to him a lot. She noted that she liked H.R., but she always had problems with H.R. She admitted calling H.R. horrible names and noted that H.R. did not treat her well. She explained that she treated H.R. "like a sister" and treated H.R. well. At this point, the trial court indicated that the jurors were having difficulty hearing M.R. and requested that she speak louder. The State did not repeat this

11

line of questioning, and H.R.'s counsel did not request that it be repeated or that the questions and answers be read to the jury.

¶ 33 On redirect examination, as M.R. was explaining that she dropped out of high school because of disputes with friends, the trial court again asked her to speak louder. M.R. then repeated her explanation.

¶ 34 Angela Owens, a child protection investigator with the Illinois Department of Children and Family Services (DCFS), testified in rebuttal for the State. She explained that DCFS received a report on October 2 about H.R.'s allegations against the defendant. The initial investigator attempted to meet with H.R.'s mother and M.R. after talking with H.R., but the investigator was unable to locate them. The case was then assigned to Owens on October 5, and Owens talked with M.R. that day at M.R.'s home. M.R. indicated that the defendant was more like a father to her than her own father, denied that he committed any kind of sexual abuse against her, and said that H.R. never disclosed any kind of sexual abuse to her. During the investigation, Owens tried on at least five occasions to have H.R.'s mother bring M.R. and her son into the child advocacy center for an interview, but she never brought them. Eventually, the son was removed from the household. M.R. was never removed from the house because she turned 18 during the investigation. Owens noted that, even without H.R.'s allegations against the defendant, she would have removed the children from the home because the condition of the home was deplorable.

¶ 35 After hearing closing arguments and the jury instructions, the jury found the defendant guilty of four counts of predatory criminal sexual assault of a child and four counts of criminal sexual assault. Subsequently, on December 22, 2021, the trial court sentenced him to 30 years' imprisonment on each count of predatory criminal sexual assault of a child and 12 years'

imprisonment on each count of criminal sexual assault, all to be served consecutively. The defendant appeals the convictions.

¶ 36                                II. ANALYSIS

¶ 37    On appeal, the defendant argues that his due process rights were violated because the jury was unable to hear all of the testimony presented at his trial.[1] Specifically, he contends that the jury expressed difficulty hearing M.R.'s testimony, but the trial court did not take the same remedial measures that were used during H.R.'s testimony, such as allowing counsel latitude in redirect and recross to go over already addressed issues or reading back specific answers, to make sure that all of M.R.'s testimony was heard. He also contends that his trial counsel was ineffective for not requesting these remedial measures. In setting forth this argument, the defendant acknowledges that he has forfeited review of his due process argument but argues that we should review the issue under either the first or second prong of the plain-error doctrine. The defendant also contends that his counsel was ineffective for failing to properly preserve the due process argument on appeal.

¶ 38    The plain error rule is a narrow and limited exception to the general rule of forfeiture. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008). Under the plain-error doctrine, a reviewing court will review an unpreserved error when a clear and obvious error occurs and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant; or (2) the alleged error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). The first

---

[1]The defendant also argued, in his initial appellant's brief, that his constitutional right to confrontation was violated, but he withdrew that argument in his reply brief. Thus, we will not address that argument in our decision.

step in the plain error analysis is determining whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 39 A defendant has a constitutional right to be tried by a fair and impartial jury and to due process. U.S. Const., amends. VI, XIV; *People v. Williams*, 2022 IL App (2d) 200455, ¶ 92. A juror who is inattentive for a substantial portion of the trial has been found unqualified to serve on the jury. *Williams*, 2022 IL App (2d) 200455, ¶ 92. The party claiming error from an inattentive juror must demonstrate that the juror failed to follow some important or essential part of the trial proceeding. *Id.* When presented with possible juror inattentiveness, the trial court has discretion to reopen *voir dire*, and the court's actions are reviewed for an abuse of discretion. *Id.* An abuse of discretion occurs where the court's ruling was arbitrary, fanciful, or unreasonable or where no reasonable person would adopt the court's view. *Id.*

¶ 40 The Second District case, *People v. Williams*, is analogous to the case here. In *Williams*, a defendant complained that, due to the social distancing COVID-19 requirements at his jury trial, the jury was spread throughout the courtroom, which resulted in several jurors being unable to hear witnesses or see evidence being presented. *Id.* ¶ 90. According to defendant, because the trial court failed to question these jurors to determine the evidence they missed or to determine if they were able to participate in deliberations fairly and impartially, the jury's verdict was unworthy of confidence and resulted in an unfair trial. *Id.*

¶ 41 Applying the principles discussed above regarding an inattentive juror, the appellate court found that defendant had not shown that any of the jurors were inattentive for a substantial portion of the trial or that they failed to follow an important or essential part of the proceeding. *Id.* ¶ 94. The court found the fact that, in a few isolated instances, some jurors expressing difficulty hearing did not establish that they actually missed any evidence. *Id.* The court noted that, instead, the

14

record demonstrated that those jurors did exactly what the trial court instructed them to do at the beginning of the trial—alert the court if they were unable to hear the witnesses. *Id.* Moreover, the court found that, in each instance, the court implemented a remedy, such as having the witness speak louder, moving a juror to a different location in the courtroom, or adjusting the volume on the video. *Id.* Thus, the court found that defendant failed to demonstrate that the manner in which the court handled the instances where the jurors expressed difficulty hearing constituted an abuse of discretion. *Id.*

¶ 42   Here, the defendant contends that his due process rights were violated because, although the trial court provided remedial measures when the jurors indicated difficulty hearing the State's witnesses' testimony, those same remedial measures were not provided when M.R., the defendant's only witness, testified. The defendant noted that M.R.'s testimony was important because she never saw H.R. being abused by the defendant, even though she was home the majority of time; she claimed that the defendant never did anything sexual with her, despite H.R.'s allegations that H.R. walked in on her and the defendant having sex; and she and H.R. always had problems with each other. The defendant argues that, because it cannot be determined whether the jury heard all of M.R.'s testimony, and there were no remedial measures taken to make sure that her testimony was heard, he received an unfair trial. We disagree.

¶ 43   Once the trial court became aware that the jurors were having difficulty hearing the witness testimony, the court implemented certain measures to make sure the witness testimony was heard, such as allowing the State leeway in redirect examination to go back over testimony that was elicited from H.R. in direct examination, instructing all of the remaining witnesses to speak louder and slower before they began testifying, reminding them to speak louder and slower during their testimony, and repeatedly instructing the jurors to raise their hands when they were having

15

difficulty hearing. Specifically regarding M.R., before she testified, the court instructed her to speak loudly and to project her voice so that all of the jurors could hear her. During direct examination, M.R. testified that she spent a lot of time at home and never witnessed any sexual behavior between H.R. and the defendant. She also indicated that the defendant never tried anything sexual with her. During this testimony, no juror expressed any difficulty hearing her, so there was no indication that the jurors did not hear this particular testimony. It was not until her cross-examination that some of the jurors indicated difficulty hearing her.

¶ 44 Before the trial court noted that the jurors were having trouble hearing M.R.'s testimony during cross-examination, M.R. had testified that she loved the defendant, she talked to him a lot, and she liked H.R. but always had problems with her. She admitted calling H.R. horrible names, noted that she treated H.R. like a sister, and noted that H.R. did not treat her well. As she was denying that she did not treat H.R. well, the court indicated that some of the jurors were signaling that they could not hear her. The court asked her to speak up a bit. The State then moved on to another line of questioning without having her repeat her answers, and there was no further indication that the jurors could not hear the remaining cross-examination. Then, on redirect examination, M.R. was explaining why she dropped out of school when the court again asked her to speak louder. M.R. repeated her explanation that time.

¶ 45 Similar to *Williams*, when the jurors signaled that they could not hear M.R.'s testimony, they were doing exactly what the trial court instructed them to do throughout the trial—alert the court if they were unable to hear the witness. The portions of M.R.'s testimony that the jurors indicated difficulty hearing was when she was testifying about how her and H.R. got along as sisters and when she was discussing why she dropped out of school. Although the testimony where the State was trying to get M.R. to admit that she did not like H.R. was not repeated, it had already

16

been established that there were difficulties in their relationship. Specifically, M.R. had already testified that she liked H.R., but she always had problems with H.R. and admitted calling H.R. horrible names. She had also testified that she treated H.R. like a sister and that H.R. did not treat her well. As previously noted, there was no indication from the jurors that this testimony was not heard. Moreover, the testimony about why M.R. dropped out of school was repeated after the jurors expressed difficulty hearing. Thus, based on the above, we find that the defendant has not demonstrated that the jurors were "inattentive" for a "substantial portion" of the trial or an essential part of the proceeding. As noted in *Williams*, the fact that the jurors expressed difficulty hearing during this testimony does not establish that they actually missed any evidence.

¶ 46    However, even assuming *arguendo* that an error existed here, the first prong of the plain-error doctrine does not apply because the evidence was not closely balanced. In determining whether the evidence adduced at trial was closely balanced, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53. This inquiry involves an assessment of the evidence on the elements of the charged offense as well as any evidence regarding the witnesses' credibility. *Id.* The evidence must not only be closely balanced but must be so closely balanced that the error alone threatened to tip the scales of justice against defendant. *People v. Mueller*, 2015 IL App (5th) 130013, ¶ 25. The evidence may be closely balanced when a case turns on a credibility determination between conflicting testimony. *People v. Scott*, 2020 IL App (1st) 180200, ¶ 51. However, there is no credibility contest where a party's account is unrefuted, corroborated by other evidence, or completely implausible. *Id.*

¶ 47    Here, the defendant contends that the evidence was closely balanced because H.R. was the only occurrence witness to the alleged sex acts, and, thus, her credibility was an issue for the jury

17

to decide. The defendant argues that M.R.'s testimony undermined H.R.'s credibility as follows: M.R. refuted H.R.'s testimony that the defendant and M.R. also engaged in a sexual act; M.R. also testified that, despite being home all the time, she never witnessed any sexual acts between the defendant and H.R.; and H.R. had motive for hurting M.R. and her mother by making false allegations against the defendant because M.R. had problems with H.R. for several years, and H.R. had not treated M.R. well. Thus, the defendant contends that, if the jury believed that M.R. was telling the truth about never having sex with the defendant and never seeing the defendant and H.R. engage in any sexual acts, then it may have found that the State failed to prove him guilty beyond a reasonable doubt, especially where H.R. had been a problem for the family and had a motive to hurt M.R. and her mother by making these allegations.

¶ 48    In making this argument, the defendant relies on *People v. Naylor*, a case in which our supreme court held that the evidence was closely balanced due to a credibility contest between the arresting officers and defendant. *Naylor*, 229 Ill. 2d at 607-08. The evidence consisted of two different accounts—one from the arresting officers and one from defendant—of the same event, neither of which was corroborated by extrinsic evidence, but both of which were credible. *Id.* Thus, according to *Naylor*, a credibility contest exists when the evidence turns on the testimony of witnesses that provide alternative versions of events, and no additional evidence is introduced to contradict or corroborate either version of events. *Id.* at 608.

¶ 49    In response, the State, relying on *People v. Williams*, 2022 IL 126918, argues that, even though this case could be considered a credibility contest, that fact alone does not warrant a finding of plain-error review under the first prong. The supreme court in *Williams* distinguished *Naylor* based on the fact that there were not two different accounts of the same event; there was only the victims' accounts of what occurred. *Id.* ¶ 61. As such, the court reviewed the evidence to determine

18

whether it was closely balanced. *Id.* ¶¶ 62-64. After reviewing the record and conducting a qualitative and commonsense assessment of the evidence, the court concluded that the evidence was not closely balanced. *Id.* ¶ 64. Thus, the State in the present case contends that, like *Williams*, we should conduct a qualitative and commonsense assessment of the evidence to determine whether the evidence is closely balanced. We agree with the State.

¶ 50    Here, there is only one version of events as to what occurred between the defendant and H.R.—H.R.'s account. Although M.R. testified that she never saw H.R. and the defendant engage in sexual activities, H.R. testified in great detail about the sexual acts that the defendant committed against her and when such acts occurred. She also testified about her reasoning for not coming forward with her allegations earlier, *i.e.*, she considered the defendant family and was protecting her family. Moreover, unlike *Naylor*, the other testimony presented at trial supported H.R.'s testimony. B.D.'s testimony about what the defendant did to her mirrored H.R.'s testimony in significant part, thus, supporting H.R.'s testimony because of the similarity in the allegations. Radcliffe's testimony about how a perpetrator groomed a child victim also bore a striking resemblance to H.R.'s account of what transpired between H.R. and the defendant. Also, the interaction between H.R. and the defendant that was witnessed by M.L. and T.L. supported the conclusion that the defendant was engaging in inappropriate sexual behavior with H.R.

¶ 51    Moreover, T.L.'s testimony about the FaceTime call between him and H.R. and their subsequent conversation where H.R. told him what the defendant was doing to her was consistent with H.R.'s testimony. Also, although Christanell testified that H.R.'s physical examination was normal, she noted that this was typical of sexual abuse victims because permanent scarring was rare. Thus, viewing the evidence in a commonsense manner in the context of the totality of the circumstances, we find that the evidence in this case was not closely balanced. Accordingly, we

19

conclude that the defendant has failed to demonstrate that the error required reversal under the first prong of plain-error review.

¶ 52 The defendant also argues that plain error occurred under the second prong of the plain-error rule. Our supreme court has equated the second prong with structural error such that automatic reversal is only warranted when the error renders a defendant's trial fundamentally unfair or unreliable. *People v. Jackson*, 2013 IL App (3d) 120205, ¶ 25. Examples of structural errors include a complete denial of counsel, trial before a biased judge, racial discrimination in the selection of the grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Id.* However, the second prong is not restricted to only the previously recognized types of structural errors. *People v. Clark*, 2016 IL 118845, ¶ 46. Moreover, prejudice is presumed under the second prong of plain error. *Sebby*, 2017 IL 119445, ¶ 50.

¶ 53 Here, again assuming *arguendo* that there was error, we conclude that the error was not a structural error requiring reversal under the second prong. As noted above, there were two instances where the jurors expressed difficulty hearing M.R.'s testimony—when she testified about her relationship with H.R. and when she testified about dropping out of school. The testimony explaining why she dropped out of school was repeated to make sure all jurors heard it. While the line of questioning where the State was attempting to determine how M.R. treated H.R. was not repeated, there had already been testimony elicited from her about her relationship with H.R. before any juror indicated that they were having trouble hearing. There was no indication that the jurors did not hear that portion of the testimony, which included her testimony that she liked H.R. but always had problems with her, her admission that she had previously called H.R. horrible names, and her testimony that she treated H.R. like a sister and that H.R. did not treat her well.

20

Thus, we conclude that any error here did not amount to a structural error that warranted plain-error review under the second prong.

¶ 54    Lastly, the defendant contends that his trial counsel was ineffective for failing to make sure that the jurors heard all of M.R.'s testimony and failing to preserve this issue for appeal. To succeed on a claim of ineffective assistance of counsel, a defendant must show both (1) that counsel's performance was objectively unreasonable and (2) that it is reasonably probable that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Alvine*, 173 Ill. 2d 273, 293 (1996). The reviewing court may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance. *Strickland*, 466 U.S. at 687; *Alvine*, 173 Ill. 2d at 293.

¶ 55    Here, for the same reasons that we found that there was no plain error, we conclude that the defendant was not prejudiced when trial counsel failed to make sure that remedial measures were taken when the jurors indicated difficulty hearing parts of M.R.'s testimony and failed to preserve the due process argument for appeal. Accordingly, we conclude that the defendant's trial counsel was not ineffective.

¶ 56                                III. CONCLUSION

¶ 57    For the foregoing reasons, we affirm the judgment of the circuit court of Bond County.


¶ 58    Affirmed.

21