NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 99

No. 2016-354

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Criminal Division |
| | |
| Jeremy R. Amidon | March Term, 2018 |

David A. Howard, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Allison N. Fulcher of Martin & Associates, Barre, for Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **SKOGLUND, J.** Defendant appeals his conviction by jury of lewd or lascivious conduct with a child. He argues that the trial court should have granted his motion for a mistrial after the State asked prejudicial questions during voir dire that tainted the jury; that the court erroneously admitted evidence of his prior incarceration; and that the State was improperly permitted to impeach the defense's sole witness with a question concerning the molestation of her daughter. We affirm.

¶ 2. In October 2013, defendant was charged with a single count of lewd or lascivious conduct with a child, second offense, for touching the vaginal area of his daughter C.A. sometime between July 2005 and July 2007. Prior to trial the State notified the defense of its intent to introduce evidence of prior bad acts, including that defendant was physically and emotionally

abusive toward C.A. and other family members and that she felt safe when he was in prison and became afraid when she learned he was being released. The State indicated that it was offering this evidence to explain why C.A. did not disclose the sexual abuse sooner. Defendant filed a motion in limine seeking to exclude the evidence on the grounds that it was irrelevant and prejudicial.

¶ 3. Following a hearing in August 2015, the court ruled that evidence of defendant's anger and possible physical abuse toward C.A. and other family members was relevant and admissible. It found that the probative value of the evidence outweighed any prejudicial effect, as the State had a reasonable need to explain why C.A.'s fear caused her to disclose defendant's act after several years of silence. The court held that the State did not have to wait for the defense to attack the witness for her delayed report, as a jury would naturally be concerned about the timing of the report. The court also ruled evidence of defendant's incarceration and release was admissible to explain why C.A. delayed in reporting and then finally did report, as "[i]t would be difficult for the jury to consider why the complainant suddenly had a fear of defendant when some years had passed without disclosure." The court concluded that the probative value of this evidence outweighed its prejudicial effect so long as proper jury instructions were given and the jury was not informed of the reason that defendant was incarcerated. However, it excluded the other evidence the State sought to introduce, including the facts underlying defendant's 2007 conviction for sexual assault on a minor and evidence of his alleged sexual assaults against other children.

¶ 4. Defendant was initially tried in January 2016, but the jury was unable to reach a verdict. A new jury was selected in May 2016. During voir dire, the State asked individual potential jurors about their prior jury experience and whether that experience had affected them in a way that they felt they could not be fair or impartial in defendant's case. The State then asked:

So of the folks that were on the jury, the—was there anything that came out in the newspaper after, that you read about the trial, that you were completely in disbelief that you didn't know that when you were in the trial, or that irked you that you didn't know that, or—so nothing about that process that—because the judge is going to instruct you to not read anything and not follow any newspaper, not to research this independently, and sometimes people are not happy about that, that they can't look up what happened, and then sometimes they hear things after that they just don't understand why they weren't told some of the things they read about. So nobody had that experience where you felt like this was not a fair and impartial jury process?

None of the potential jurors responded affirmatively.

¶ 5. The prosecutor went on to ask the jurors several questions on other topics. After the prosecutor concluded her voir dire, defense counsel objected to the prosecutor's questions about finding out information after the trial. The prosecutor responded that the questions were aimed at discovering whether members of the jury panel who had served on juries the previous month were frustrated by the process. The court overruled the objection, stating that the questioning "didn't indicate one way or another which—what they could have read, whether it could have been pro-defendant or pro-State. It was neutral questioning."

¶ 6. After jury selection but prior to trial, defendant moved for a mistrial, arguing that the jury had been irrevocably tainted by the prosecutor's questioning. He argued that the questions planted an idea in the minds of the jurors that prejudicial information was being withheld from them in this case, and a simple internet search would reveal that defendant had been previously convicted for sexual assault on a child. He argued that even if the jurors obeyed the court's standard instructions not to conduct their own outside research about defendant, the State had created a prejudicial suspicion that other information existed. The court ruled that it would take up the motion at the beginning of the trial, stating that "[u]nless it is shown by the required supplemental exam that a juror has actually obtained inappropriate information about defendant or the case, the court does not believe the questioning defendant objects to is sufficient for a mistrial."

¶ 7.    On the first morning of trial, the court reiterated its determination that the questioning itself did not taint the jury.  It went on to ask the jury if anyone had learned anything about defendant or the case since jury selection, and received no response.  The jury was then sworn and the trial began.

¶ 8.    The following facts were presented at trial.  Defendant lived with his wife, Yvonne Pratt, and their five children in a three-bedroom mobile home in Woodford, Vermont, from 2004 to 2007.  The boys slept in one bedroom, the girls in another, and defendant and Yvonne slept in the third.  Yvonne worked a night shift.  While she was at work, Fred Bessette, a friend of defendant, watched the children.  He was paid by the State to look after the children because defendant was on medication and partially disabled.  Defendant was usually sleeping or on his computer.  Fred's wife Ida accompanied him when he was at defendant's home, but she did not have childcare duties and spent most of her time on another computer.

¶ 9.    Yvonne, one of her sons, and her daughter C.A. testified that defendant only interacted with his children to discipline or yell at them.  Defendant made the children stand in the corner for hours and lick paint off the wall.  He also made them sit in the "invisible chair," which involved sitting with their backs against the wall and supporting their weight with their legs, and run laps around the mobile home park while he followed them in a vehicle.  Yvonne did not intervene because defendant would become violent toward her in front of the children.

¶ 10.    In early 2007, defendant went to prison in Kentucky.  Yvonne visited him there a few times with the children, who did not want to go.  She eventually ended her relationship with defendant.  Around 2013, defendant was released from prison.  Yvonne received some court documents indicating that defendant wanted visitation with the children.  When she told C.A. that defendant wanted to have contact, C.A. cried and said she wasn't going to see him.

¶ 11.    C.A. testified that she was scared when she learned that defendant was getting out of prison and wanted contact with her because he had touched her sexually when she was younger.

4

She told her grandmother, who told Yvonne. C.A. refused to speak to Yvonne about defendant's act, but Yvonne told her that she needed to talk to somebody. C.A. eventually told the dean of students at her high school, who reported the conversation to the Department for Children and Families, which then interviewed C.A.

¶ 12. C.A. testified the lewd or lascivious conduct charged occurred when she went into defendant's bedroom to tell him that dinner was ready. She was wearing a nightgown and underwear. He was sitting on the bed, and his hand went under her underwear. Defendant told her that he would hurt her mother if she told anyone. She believed him because she had heard him threaten her mother before and because of the way he disciplined her and her siblings.

¶ 13. The jury returned a verdict of guilty. In September 2016, defendant was sentenced to serve four to six years. This appeal followed.

I.

¶ 14. The first issue before us is whether the trial court properly ruled that the prosecutor's questions during jury selection did not amount to a prejudicial extraneous influence on the jury sufficient for the court to declare a mistrial.[1] The decision whether to grant a new trial is a matter committed entirely to the discretion of the trial court. State v. Jewell, 150 Vt. 281, 284, 552 A.2d 790, 792 (1988). The court's decision will be upheld unless that discretion was abused or withheld. State v. McKeen, 165 Vt. 469, 472, 685 A.2d 1090, 1092 (1996).[2]

---

[1] We disagree with the State's suggestion that defendant waived this argument by failing to raise it in a timely fashion. Defendant objected during jury selection and renewed his argument in a pretrial motion, giving the trial court ample time to correct any error. Cf. State v. Bartlett, 137 Vt. 400, 405, 407 A.2d 163, 166 (1979) (noting that defendant's failure to move for mistrial when facts about misconduct of juror became known ordinarily would result in waiver; "[a] defendant cannot gamble on a favorable verdict, but must make prompt objection and motion for mistrial").

[2] Defendant's motion for mistrial was arguably incorrect because the jury had not yet been impaneled. State v. Herrick, 2011 VT 94, ¶ 12, 190 Vt. 292, 30 A.3d 1285. The form of defendant's objection does not affect our decision to uphold the trial court. Id.

¶ 15. A criminal defendant is entitled to a fair trial by an impartial jury, "free of the suspicious taint of extraneous influences." State v. Wool, 162 Vt. 342, 353, 648 A.2d 655, 662 (1994); U.S. Const. amend. VI; Vt. Const. ch. I, art. 10. A defendant who seeks a mistrial based on alleged jury taint must show that "an irregularity—i.e., anything creating any suspicion of extraneous influences—had the capacity to influence jury deliberations." State v. Schwanda, 146 Vt. 230, 232, 499 A.2d 779, 781 (1985) (quotation omitted). If such an irregularity is shown, the opposing party must demonstrate that it had no actual effect on the jury. Id. at 232, 499 A.2d at 781-82.

¶ 16. Although the trial court did not use the precise language above, it essentially concluded that defendant failed to meet the first prong of the test described in Schwanda. The court ruled in response to defendant's motion and at the outset of trial that the prosecutor's questioning of the jury pool, by itself, did not taint the jury.[3] It explained its reasoning when defendant initially objected at jury selection: the questioning was neutrally phrased and did not suggest that there was extraneous information favoring one side or the other. After defendant renewed the objection, the court also noted that none of the potential jurors responded affirmatively to the State's questions at voir dire. The court pointed out that by defendant's logic, jurors would be improperly influenced by the court's routine instructions not to conduct their own outside research of the case. Moreover, it found no evidence that the questioning actually affected the jury in the manner suggested by defendant.

¶ 17. The court's decision was not an abuse of its discretion. "[T]he trial judge is in the best position to determine whether a jury has been tainted, and '[c]onsequently, every reasonable presumption in its favor is accorded to the ruling below.' " State v. Grega, 168 Vt. 363, 370, 721 A.2d 445, 451 (1998) (quoting McKeen, 165 Vt. at 472, 685 A.2d at 1093) (alterations in original).

_____

[3] For this reason, we reject defendant's assertion that the trial court failed to address his argument that the jury had been affected by the questions themselves.

6

We note that the prosecutor's questions did not introduce any extraneous information about defendant to the jury panel. Cf. State v. Johnson, 2013 VT 116, ¶ 17, 195 Vt. 498, 90 A.3d 874 (holding that potential juror's comment that she knew defendant was involved in another case "undeniably constituted an irregularity because it introduced extraneous information regarding defendant to the jury panel"). Even if the questioning had the potential to suggest that there might be additional information about the case to which the jurors were not privy, the trial court concluded based on the context of the questioning, the neutral phrasing, and the lack of response from the jury that the possible prejudicial influence resulting from that suspicion was minimal. See McKeen, 165 Vt. at 473, 685 A.2d at 1093 (noting that "the crucial factor in deciding when jury exposure to extraneous information requires a new trial is the degree and pervasiveness of the prejudicial influence possibly resulting from that exposure" (quotation omitted)). See also State v. McCarthy, 2012 VT 34, ¶ 26, 191 Vt. 498, 48 A.3d 616 (affirming denial of motion for mistrial where defendant failed to show that jury view gave rise to irregularities with capacity to influence verdict); Wool, 162 Vt. at 353, 648 A.2d at 663 (holding that court acted within discretion in denying defendant's motion for new trial based on alleged jury bias where nonjuror's statement to group of jurors that defendant "had to be on something" was ambiguous, and there was lack of response to court's general inquiry about extraneous influences). Our review of the record does not show this to be an untenable conclusion. We therefore affirm the trial court's decision to deny defendant's motion for mistrial.

## II.

¶ 18. Defendant next argues that he was denied a fair trial because the trial court admitted evidence of his prior incarceration during the prosecution's case-in-chief.

¶ 19. Under Vermont Rule of Evidence 404(b), evidence of prior crimes or bad acts is not admissible to prove that a person has a bad character or that he or she had a propensity to commit such acts. "It may, however, be admissible for other purposes, such as proof of motive,

7

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." V.R.E. 404(b). The State argued below that the evidence of defendant's prior incarceration was relevant and admissible for a permissible purpose, that is, to explain C.A.'s silence during the years after the abuse while defendant was incarcerated and her decision to finally report it in 2013. On appeal, defendant does not argue that the challenged evidence was irrelevant or offered for an impermissible purpose. Rather, he argues whatever probative value the evidence of incarceration had was outweighed by its prejudicial effect.

¶ 20. Evidence that is admissible under Rule 404(b) must still satisfy the balancing test set forth in Rule 403. State v. Bruyette, 158 Vt. 21, 30, 604 A.2d 1270, 1274 (1992). That rule provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." V.R.E. 403. The trial court has broad discretion when deciding whether to admit or exclude evidence under Rule 403, and we will reverse its ruling only where that discretion was abused or withheld. State v. Cameron, 2016 VT 134, ¶ 19, 204 Vt. 52, 163 A.3d 545.

¶ 21. "Virtually all evidence for the prosecution in a criminal case is prejudicial to some degree at least against the accused." State v. Parker, 149 Vt. 393, 400, 545 A.2d 512, 517 (1988). Thus, Rule 403 requires the exclusion of evidence only if it is unfairly prejudicial to the defendant. Bruyette, 158 Vt. at 31, 604 A.2d at 1274. Evidence is unfairly prejudicial when its primary purpose "is to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." Id. (quotation and alterations omitted). In weighing the probative value of prior bad act evidence against its prejudicial effect, the trial court considers the prosecution's need for the evidence, its probative value, and its potential to make the jury hostile toward defendant. Id. at 31, 604 A.2d at 1274-75.

8

¶ 22.   Here, the trial court found that if the jury were not informed of defendant's incarceration and release, it would be difficult for them to understand why C.A. suddenly became frightened of defendant after several years had passed during which she had not disclosed the abuse.[4]   The trial court acted within its discretion in concluding that the disputed evidence was necessary to an understanding of C.A.'s testimony.   Without this evidence, C.A.'s delayed reporting would be difficult to understand, and "[t]he resulting gaps in the narrative would detract from its 'ring of truth.' "  State v. Searles, 159 Vt. 525, 529, 621 A.2d 1281, 1284 (1993); see State v. Ankeny, 2018 MT 91, ¶¶ 32-34, 417 P.3d 275 (holding that letters defendant wrote to complainant from prison, which contained references to his incarceration, were admissible in trial for domestic assault for permissible purpose, i.e., to show why complainant delayed reporting assault, and trial court did not abuse discretion in finding probative value of letters outweighed prejudice).

¶ 23.   Moreover, the court limited the prejudicial effect of the evidence.   Pursuant to the court's pretrial ruling, the reason for defendant's incarceration was not disclosed to the jury.[5]

---

[4]  Defendant argues that he made clear prior to trial that he was not challenging C.A.'s credibility based on her delay in reporting.  Thus, he says, her behavior could have been explained by other, less prejudicial information in the record, including testimony of a detective and a social worker that victims of abuse often wait months or years before coming forward; evidence of defendant's harsh discipline against the children and violence towards their mother Yvonne Pratt; and evidence that Pratt had ended the relationship and defendant was seeking visitation after some years had passed.  However, the trial court concluded that the jury would wonder about the delay even if defendant did not highlight it and would have a difficult time understanding C.A.'s behavior if it did not know that defendant had been in prison for several years and was released around the time C.A. made her report.  "[T]his Court will not interfere with discretionary rulings of the trial court that have a reasonable basis, even if another court might have reached a different conclusion."  Parker, 149 Vt. at 401, 545 A.2d at 517 (quotation omitted).

[5]  Defendant claims that the State twice told the jury during its cross-examination of his witness, Ida Bessette, that his prior incarceration was for the same conduct for which he was on trial.  The record does not support this assertion.  The State asked Bessette, "Did you testify at your deposition that you did not believe he did what he was in jail for?"  Later, the State asked, "So your testimony, as you sit here today, is that the fact that you've been friends with him for twenty years and that you don't believe he could have committed a crime he was actually in jail for does not prevent you from testifying truthfully about what you saw?"  At no point did the

9

Further, the court instructed the jury that the evidence was admitted for the limited purpose of explaining the timing of C.A.'s report and that they should not consider it as evidence of defendant's character or that he committed the offense for which he was on trial. The court also instructed the jury that the reason for his prior incarceration was not relevant and that they should not speculate about or consider it. In the absence of evidence to the contrary, we presume that the jury followed the court's limiting instructions. State v. Messier, 2005 VT 98, ¶ 15, 178 Vt. 412, 885 A.2d 1193; see also Commonwealth v. Foxworth, 40 N.E.3d 1003, 1013-14 (Mass. 2015) (affirming trial court's admission of evidence of defendant's incarceration where evidence was relevant to motive and court limited prejudice by excluding reason for incarceration and instructing jury they could not consider it for propensity purposes); State v. Palermo, 168 N.H. 387, 396, 129 A.3d 1020 (2015) (holding trial court did not abuse discretion by admitting evidence of defendant's prior incarceration, parole status, and civil lawsuit against state prison for limited purpose of explaining how victim and defendant met where criminal conduct underlying incarceration was not introduced and court issued limiting instructions to jury). Therefore, the admission of the evidence was not error.

III.

¶ 24. Finally, defendant claims that he was denied a fair trial because the State was permitted to impeach his witness with a question concerning the molestation of her daughter.

¶ 25. Defendant's sole witness was Ida Bessette. She testified that she and her husband Fred were at defendant's home in Woodford up to twelve hours a day, seven days a week. From where she usually sat, she could see into defendant's bedroom and could hear conversations in that room. She never saw any interactions between defendant and the children that bothered her. She

---

prosecution mention the reasons underlying defendant's prior incarceration during its examination of Ida Bessette, and the questions did not suggest what his crime may have been.

testified that neither C.A. nor the other children were allowed to go into the bedroom. Fred was the only person who was allowed to wake up defendant when he was sleeping.

¶ 26. On cross-examination, the following exchange took place between the prosecutor and the witness:

> Q. And so is it your testimony that you would have known if something had happened?
>
> A. Yes.
>
> Q. You believe that, if anything had happened to C.A., you would have known about it?
>
> A. Yeah.
>
> Q. But you didn't know when your own daughter was the victim of a molestation?

Defense counsel objected, arguing that the molestation of Bessette's daughter was irrelevant. The prosecutor argued that the question was permissible for impeachment purposes, because Bessette's claim that she would have known if C.A. had been molested was called into doubt by the fact that Bessette's daughter had been molested for years under her own roof. The trial court ruled that Bessette could answer the question but that no further inquiry into the topic would be allowed. Bessette answered, "Yes, I did." The State then asked, "And were you told by someone about that?" The defense objected, and the court sustained the objection on the ground that it was a collateral issue.

¶ 27. On appeal, defendant argues that the State should not have been permitted to ask Bessette about the molestation of her daughter because it was irrelevant, inflammatory, and concerned a collateral issue.

¶ 28. The trial court has broad discretion in determining the scope of cross-examination, and its decision will not be reversed unless that discretion is abused or withheld. State v. Voorheis, 2004 VT 10, ¶ 28, 176 Vt. 265, 844 A.2d 794. The court's ruling was not improper. Bessette asserted that she would have known if anything had happened to C.A. The prosecutor's

11

questioning was intended to suggest that Bessette was not as observant as she claimed or that she was deliberately covering up for defendant due to her personal friendship with him. A witness's personal bias and capacity to observe or remember are fair subjects for cross-examination. Reporter's Notes, V.R.E. 607. The rule is that "a witness may be cross-examined as to collateral facts which tend to test his accuracy or veracity, but the cross-examiner must be content with the witness' answers, and cannot contradict them by independent proof." State v. Jackson, 126 Vt. 250, 256, 227 A.2d 280, 284 (1967); see also State v. Berard, 132 Vt. 138, 147, 315 A.2d 501, 508 (1974) (explaining that credibility of witness is always open to attack, though court may restrict examination on collateral issues). The trial court acted within its discretion in allowing the single question and restricting further examination on the topic.

Affirmed.

FOR THE COURT:

_____

Associate Justice