NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 74

No. 23-AP-068

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Franklin Unit, |
| | Criminal Division |
| | |
| Rodney L. L'Esperance | October Term, 2024 |

Martin A. Maley, J.

Evan Meenan, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and A. Alexander Donn, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.

¶ 1. **EATON, J.** Defendant appeals from his conviction of aggravated assault following a jury trial. He argues that the court erred in denying his motion for a new trial. We affirm.

## I. Proceedings Below

¶ 2. Defendant was charged with attempted second-degree murder for allegedly stabbing his roommate in the neck with a fillet knife in November 2019. Defendant admitted stabbing his roommate but argued that he acted in self-defense.

¶ 3. The following evidence was presented at trial. Defendant's roommate testified that, before the stabbing incident, he and defendant "had a great relationship" and they "were big time

drinking buddies." They occasionally wrestled with each other. On the evening in question, the roommate and defendant were at a bar together. They started wrestling, which "[g]ot a little aggravated on both sides" and "out of hand." They exchanged words and the roommate struck defendant. Defendant injured his ankle during the scuffle and broke his glasses. Defendant was angry at his roommate, stating that they had taken things too far. The bartender told the roommate to go home, which he did, leaving his phone behind. The roommate got home around 2:00 a.m. and went to bed. Defendant stayed at the bar and later walked home with the bartender.

¶ 4. The roommate noticed when defendant returned home but then fell back asleep. The roommate later woke up with shooting pain in his neck. The roommate saw defendant standing over him with his hand at the roommate's neck and the blade of a knife "plunged deep and upwards." Defendant pulled out the knife and the roommate grabbed defendant and put up his hands to protect himself. The knife was very sharp and the roommate's hands were badly injured when defendant tried to stab the roommate again. The roommate recognized the knife as one that defendant kept by his bed and used for ice fishing and hunting. Defendant was hysterical. The roommate told defendant to call 911, which he did.

¶ 5. The bartender also testified. He said he had known defendant and the roommate for about eight years. The bartender described the scuffle at the bar that evening and testified that defendant was mad at the roommate. The bartender told the roommate to leave the bar and the roommate left in a huff, leaving behind his jacket and cellphone. The bartender and defendant left the bar around 2:30 a.m. On their walk home, defendant's ankle was hurting and defendant grew increasingly upset. The bartender testified that defendant threw the roommate's phone on the ground and broke it; defendant also mentioned having an ice fishing fillet knife and said that if the roommate "tried that again, he would get it." The bartender said defendant iced his ankle at the bartender's house for about an hour. Defendant left around 4:30 a.m.

2

¶ 6.    The State asked the bartender why he hadn't revealed defendant's statement about the knife at defendant's weight-of-the-evidence hearing. The bartender responded that he had answered a specific question posed to him at that hearing and had not elaborated. Defense counsel also cross-examined the bartender about why he hadn't disclosed this statement during the weight-of-the-evidence hearing. An additional witness testified and the State rested.

¶ 7.    After defendant presented one witness, defense counsel asked the court to take judicial notice that the bartender had a recent driving-under-the-influence (DUI) charge that was dismissed without prejudice several months before defendant's trial. Defendant wanted the court to provide this information to the jury. The court denied the request, questioning whether it was an appropriate subject for judicial notice. The court indicated that defendant could recall the bartender to inquire about the DUI dismissal. Defendant chose not to do so.

¶ 8.    The attorneys wore face masks during defendant's June 2022 trial because of the COVID-19 pandemic. The court alerted counsel, beginning with the jury draw, of the need to speak up given the use of masks. It repeated this request during trial when it had difficulty hearing counsel. During a recess on the second day of trial, which followed defense counsel's direct examination of defendant, the court told the attorneys, particularly defense counsel, that the jurors were having trouble hearing the questions. The court indicated that it had repeatedly told defense counsel to speak up throughout the trial and that, for whatever reason, counsel did not consistently do so. Defense counsel did not seek any relief that day. The proceedings continued and the State cross-examined defendant followed by defense counsel's redirect.

¶ 9.    During his testimony on direct, cross-examination, and redirect, defendant asserted that he acted in self-defense. According to defendant, when he got home, the roommate was sitting on the edge of his bed, telling his dogs to be quiet. Defendant heard the roommate say that he missed his kids and he wanted to kill himself. Defendant asked from his bedroom what was going on. The roommate repeated that he missed his kids and wanted to kill himself. Defendant got up,

3

grabbed his fillet knife, and went into his roommate's bedroom. He said he took the knife because the roommate had been acting unpredictably that evening. He later testified that the roommate first threated to kill defendant while defendant was in his own bedroom. According to defendant, once he entered the roommate's bedroom, the roommate threatened to kill other people, including threatening twice to kill defendant. While defendant's back was half-turned to the roommate, defendant heard the roommate get off the bed. He turned and saw the roommate coming at him and defendant was afraid the roommate would try to take the knife and kill defendant. Defendant swung around with his knife and felt it hit the roommate. The roommate fell back onto the bed. Defendant then called 911 and tried to assist the roommate. During his direct testimony, defendant played a video reenactment of what he said occurred that evening. He then explained what was on the video. Videos from the responding police officer's body camera were also played for the jury.

¶ 10. Defendant stated numerous times during his direct examination that he did not intend to kill the roommate. The court commented on the repetitive nature of the testimony but allowed it. Defendant then testified again that the roommate had threatened to kill defendant three times in their shared apartment that evening, including once while defendant was in his own bedroom. This assertion was repeated on cross-examination. The State also repeated portions of defendant's direct testimony and asked him about it. On redirect, defendant again testified as to his version of events that evening, including asserting that the roommate threatened defendant three times that evening. The court again flagged the repetitive nature of the testimony but allowed it.

¶ 11. The following day, defendant moved for a mistrial on several grounds. He first asserted that a mistrial was warranted based on the court's earlier statement that the jurors had difficulty hearing defense counsel. Defendant argued that it was incumbent on the court to make sure that the jury could hear defense counsel.

4

¶ 12.    The court rejected this argument.  It indicated that it did not see a way to cure the issue and reiterated that it had admonished defendant's attorneys during trial to ensure they were keeping their voices up, but they had continued to drop their voices.  The court noted that the witnesses had at times asked the attorneys to speak up, as had the court.  It added that defendant had not appeared to have any difficulty hearing his counsel's questions, which defendant had answered during his testimony.  The court also pointed out that when defendant did have difficulty hearing anything, he had asked the attorney to repeat the question.  The court thus did not believe that there was a problem with the jurors not fully hearing the attorney's questions, although it recognized that they had expressed some concern about that.  The court believed that this issue fell to the attorneys, not the court, given its repeated admonishment to speak up.  Counsel responded that he did not want to be seen as appearing overly aggressive or yelling.  The court indicated that, if this was a strategy, counsel took the risk of not being heard.

¶ 13.    Defendant also sought a mistrial because the State had not timely disclosed the bartender's statement about what defendant allegedly said to the bartender on their walk home.  The bartender made this statement to a police officer in January 2020 and it was recorded on the officer's body camera but it was not disclosed to the defense.  The court found a discovery violation but did not find any prejudice from the late disclosure as it was not apparent what defense counsel would have done differently during his cross-examination of the bartender.  The court offered various opportunities to defendant to address this issue, all of which defendant declined.  The court denied defendant's request to strike the bartender's statement about the knife from the record.  The jury subsequently found defendant guilty of aggravated assault, a lesser-included offense of attempted second-degree murder.

¶ 14.    Defendant then moved for a new trial.  Under the heading "court administration," defendant complained that: on the WebEx video conferencing platform used for remote witness participation during trial, sidebar conversations with counsel and the judge were not muted and

anyone on WebEx could hear them; the microphones used at the defense table provided "no practicable way to have a confidential conversation" without muting the entire court's record; and the court had a "duty to assure, despite COVID-19 modifications, that trials are conducted in a way that assures all jurors can hear."[1] Defendant provided no legal authority in support of these assertions. Defendant also challenged the court's treatment of the discovery violation and its decision not to take judicial notice of the bartender's DUI dismissal.

¶ 15. Following a hearing, the court denied defendant's motion for a new trial, as well as defendant's motion for reconsideration. Regarding the technological complaints, the court found that the WebEx platform and FTR recording system had been equally helpful and annoying to both parties at trial. The court had informed defense counsel and defendant that if they needed to discuss things with one another during trial, it could accommodate them by pausing the trial and allowing them to step out to discuss the matter privately. For briefer conversations, the court had advised defense counsel that they could cover the microphone and whisper when discussing at their table. The court did not find that the WebEx or FTR recording technology prejudiced defendant or deprived him of a fair trial. It rejected defendant's argument that the court was to blame for any difficulty the jury might have had in hearing defense counsel's questions. It explained that it had done everything it could, early and often, to ensure those questions were heard. To the extent that the jury might not have heard some of those questions, the onus was on defense counsel to keep their voices up and the court had done all it could to ameliorate that issue. The court rejected defendant's discovery and judicial notice arguments as well. This appeal followed.

---

[1] We note that in March 2020, after the Vermont Governor's "general declaration of a statewide emergency resulting from the COVID-19 pandemic," this Court "issued Administrative Order 49 containing a Declaration of Judicial Emergency . . . for the purpose of protecting the health of all Judiciary personnel and courthouse visitors and mitigating the spread of the virus." Administrative Directive No. PG-13, at *1 (eff. Sept. 1, 2021) (recounting history of A.O. 49). That order authorized the Court Administrator "to issue directives regarding access to and conduct in Judiciary buildings, including requirements related to screening, social distancing, and masks, as reasonably necessary to mitigate risk to health of court users or court personnel." Id.

6

## II. Arguments on Appeal

¶ 16.   Defendant challenges the denial of his motion for new trial, articulating a new argument on appeal.  He now asserts that the court committed plain error and structural error by failing to sua sponte examine jurors to determine if there were questions from defense counsel they could not hear.  He also complains that the court failed to ensure that he could have a private conversation with defense counsel at the defense table.  Additionally, defendant reiterates his arguments that the court erred in how it addressed the discovery violation referenced above and erred by declining to take judicial notice of the bartender's DUI dismissal.[2]

¶ 17.   The trial court has discretion in granting a new trial in the "interests of justice," V.R.Cr.P. 33, and our review is for abuse of discretion only.  State v. Desautels, 2006 VT 84, ¶ 10, 180 Vt. 189, 908 A.2d 463 (quotations omitted).  Unpreserved errors generally are reviewed for plain error.  State v. Lampman, 2011 VT 50, ¶ 6, 190 Vt. 512, 22 A.3d 506 (mem.).  As set forth below, the court did not err in denying defendant's motion for a new trial.

### A. Jury's Ability to Hear Defense Counsel

¶ 18.   Defendant asserts that he was improperly tried by jurors who could not "comprehend testimony" and he was therefore denied a fair trial by an impartial jury.  He cites cases involving hearing-impaired jurors who could not hear portions of witness testimony.  See State v. Turner, 521 N.W.2d 148, 151 (Wis. Ct. App. 1994) (holding that defendant denied fair trial where trial court found two hearing-impaired jurors could not hear testimony from child victims; explaining that missed testimony bore on "defendant's guilt or innocence," and given trial court's finding that jurors missed material testimony, "prejudice must be assumed for the sake of insured fairness" (quotation omitted)); Commonwealth v. Hodges, No. 1746 WDA 2024, 2015

---

[2]  For the first time in his reply brief, defendant also challenges the denial of his motion for a mistrial.  This argument is not properly raised and we therefore do not address it.  See, e.g., Gallipo v. City of Rutland, 2005 VT 83, ¶ 52, 178 Vt. 244, 882 A.2d 1177 (stating that issues not raised in original brief may not be raised for first time in reply brief).

WL 5935408, at *3 (Pa. Super. Ct. Sept. 24, 2015) (finding it "settled that a defendant is entitled

to a jury verdict arrived at by . . . jurors based upon the evidence introduced at trial," and stating

that "verdict must be set aside" if "one or more of the jurors is unable to hear and understand the

evidence and testimony presented at trial," but denying relief because defendant failed to timely

move for a mistrial after learning that some jurors could not hear portions of testimony).  Defendant

relies on State v. Kandzior, 2020 VT 37, ¶¶ 27-28, 212 Vt. 260, 236 A.3d 181, in support of his

assertion that the trial court's "failure to investigate" which questions the jury had difficulty

hearing is "structural error."

¶ 19.   We reject defendant's structural-error argument.  As the U.S. Supreme Court has

explained:

> The purpose of the structural error doctrine is to ensure insistence
> on certain basic, constitutional guarantees that should define the
> framework of any criminal trial.  Thus, the defining feature of a
> structural error is that it affects the framework within which the trial
> proceeds, rather than being simply an error in the trial process itself.
> For the same reason, a structural error defies analysis by harmless
> error standards.

Weaver v. Massachusetts, 582 U.S. 286, 294-95 (2017) (citations omitted).  Stated differently:

> Structural errors infect the entire trial process, and necessarily
> render a trial fundamentally unfair.  They are also rare.  The [U.S.]
> Supreme Court has repeatedly recognized that the commission of a
> constitutional error at trial alone does not entitle a defendant to
> automatic reversal.  Indeed, if the defendant had counsel and was
> tried by an impartial adjudicator, there is a strong presumption that
> any other constitutional errors that may have occurred are not
> structural and are subject to the harmless-error analysis . . . .  The
> limited circumstances in which structural errors have been found [by
> the U.S. Supreme Court] include a biased trial judge, denial of
> counsel, denial of self-representation, denial of public trial, race
> discrimination in the selection of the grand jury, directing entry of
> judgment in favor of the prosecution, a defective reasonable-doubt
> instruction, and failing to give oral instructions to the jury.  Defining
> features of a structural error include that (1) it deprives defendants
> of the basic protections without which a criminal trial cannot
> reliably serve its function as a vehicle for determination of guilt or
> innocence, and (2) it defies analysis by harmless error standards
> because (a) the right at issue protects some interest other than

8

avoiding erroneous convictions, (b) the effects of the error are difficult to identify or measure, and/or (c) the error is of a nature that always results in fundamental unfairness.

United States v. Knight, 56 F.4th 1231, 1235-36 (9th Cir. 2023) (citations and alterations omitted).

¶ 20. In Kandzior, 2020 VT 37, ¶¶ 27-28, the Court considered a claim of alleged jury taint and "structural error." The defendant there argued that "his right to a fair trial was violated because the jury was exposed to 'extraneous, highly prejudicial information'—namely, the substance of an undetermined number of bench conferences that occurred during the three-day trial." Id. ¶ 1. The defendant "did not immediately move for a mistrial upon learning that the jury may have overheard various bench conferences," and thereby failed to preserve his jury-taint claim. Id. ¶ 11. Nonetheless, the Court held that because the trial court did not investigate a possible extraneous influence brought to its attention, there was no way in which to evaluate what the jury might have heard and "if in fact any prejudice has been created." Id. ¶¶ 26-27. "Accordingly," the Court concluded, "the failure to investigate possible jury taint and establish an evidentiary basis for determining if the jury was fair and unbiased amounts to plain error." Id. ¶¶ 27; 13 (explaining that "[p]lain error consists of glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights" and "[t]o reverse on plain error, we must find not only that the error seriously affected substantial rights, but also that it had an unfair prejudicial impact on the jury's deliberations" (citation omitted)).

¶ 21. The Court did not require the typical plain-error showing "that the error affected [a] defendant's substantial rights and had a prejudicial impact on the jury." Id. ¶ 28. It considered "the failure to investigate [a] possible jury taint" to be "a structural error that affects substantial rights and can be corrected without a specific showing of prejudice." Id. ¶¶ 28, 30 (stating that "[s]tructural error involves defects that affect the framework in which the trial proceeded, and thus, prevent the trial from serving its function as a vehicle for determining the guilt or innocence of the defendant"). Because it could not "quantitatively assess[] how the jury was affected," the Court

9

considered the failure to investigate possible extraneous influence to be a "structural error." Id.

¶ 31. The Court added two caveats to its holding, noting that "the duty to investigate occurs only when the trial court discovers the possibility of jury taint," and that "trial courts retain broad discretion in how they choose to investigate possible jury taint" "given the diverse array of juror-irregularity cases." Id. ¶¶ 33-34 (quotation omitted).

¶ 22. Defendant argues that, like Kandzior, the trial court here erred by "fail[ing] to investigate" a "significant known jury irregularity." He maintains that when the court learned that jurors had not heard questions posed by defense counsel, it was obligated to inquire sua sponte "how the jury was affected." Id. ¶ 31. Defendant contends that because the court failed to investigate, there is no record by which to measure prejudice and therefore, structural error exists. He also asserts, for the first time on appeal, that he was denied his constitutional right to present a complete defense.

¶ 23. We are unpersuaded by these arguments. Kandzior is distinguishable from the facts presented here. First, this is not a "jury taint" case. See generally State v. Amidon, 2018 VT 99, ¶ 15, 208 Vt. 360, 198 A.3d 27 (recognizing that defendant entitled to "a fair trial by an impartial jury, free of the suspicious taint of extraneous influences," and defendant "who seeks a mistrial based on alleged jury taint must show that an irregularity—i.e., anything creating any suspicion of extraneous influences—had the capacity to influence jury deliberations"; and explaining that "[i]f such an irregularity is shown, the opposing party must demonstrate that it had no actual effect on the jury" (emphasis added) (quotations omitted)); see also State v. Onorato, 142 Vt. 99, 105, 106 453 A.2d 393, 398 (1992) (recognizing that "where a suggestion of taint or bias is raised regarding an empanelled jury . . . reversible error does not depend on a showing of actual prejudice," and "defendant need only show the existence of circumstances capable of prejudicing the deliberative function of the jury"; and explaining that this holding is "limited to situations where the trial court, upon discovering the possibility of jury prejudice, fails to voir dire the jury to determine if in fact

any prejudice has been created"); State v. Schwanda, 146 Vt. 230, 233, 499 A.2d 779, 782 (1985) (explaining that "[t]he irregularity to be guarded against is taint by external causes tending to disturb the exercise of deliberate and unbiased judgment"). This case is not about "the suspicious taint of extraneous influences" that allegedly "had the capacity to influence jury deliberations." Amidon, 2018 VT 99, ¶ 15. The framework for analyzing jury-taint questions is not applicable here and the holding in Kandzior is limited to jury-taint cases.

¶ 24. Additionally, the allegation here is that the jury could not hear defense counsel's questions, not witness testimony. See State v. Wigg, 2005 VT 91, ¶ 26, 179 Vt. 65, 889 A.2d 233, (recognizing that "counsel's questions . . . are not evidence for the jury to consider"). While counsel maintains that his questions were integral to understanding the witness's answers, there is very little specificity in the record about what questions, if any, the jury was unable to hear. On multiple occasions during the trial, the court told defense counsel that it was having trouble hearing him and asked him to speak up. During a recess following defendant's direct examination by defense counsel, the court said:

> I just want to alert mainly defense counsel that the jurors are not hearing your questions. And we're getting feedback from the jurors that they did not hear you. So I can only admonish you so many times to keep your voices up. . . . I can only repeat it so many times. . . . It's been continuous, off and on. It's been a problem and I've warned you. It's not something that we can recreate now.

Defense counsel responded that he "never was told that the jury couldn't hear me." The court replied:

> [I]f I can't hear you, the jury can't hear you. And I've asked you to keep your voices up. . . . [T]he jurors are now indicating they're not hearing . . . defense counsel. . . . I don't know how much they didn't hear, but it's an ongoing issue. And I don't know why you can't keep your voices up. . . . But it's a problem. And it's too late to correct it now.

The State then cross-examined defendant. Defense counsel engaged in redirect and elicited again defendant's version of events. Defendant did not move for a mistrial until the following day. He

11

never asked the trial court to inquire of the jury what questions, if any, it struggled to hear, in his motion for a mistrial, his motion for a new trial, or otherwise.

¶ 25. We recognize the unique circumstances in place during this trial due to the COVID-19 pandemic, including the use of face masks by counsel for both the State and defendant. The trial court was mindful of these unique conditions. It flagged this issue for counsel at the outset of these proceedings, and when it had difficulty hearing defense counsel during trial, it told defense counsel to speak up. Perhaps because, as counsel expressed to the court, he did not want to be seen as overly aggressive or yelling, defense counsel continued to drop his voice. When the court learned that jurors had expressed some difficulty in hearing counsel, primarily defense counsel, it brought the matter to the attention of defendant and the State. Notwithstanding defendant's failure to request any particular relief after learning of this information, the court, in its role of overseeing defendant's criminal trial, could have sought more specificity from jurors. See State v. Richards, 144 Vt. 16, 19, 470 A.2d 1187, 1189 (1983) (recognizing that "[i]n matters of trial conduct . . . trial court has wide discretion"). Its failure to do so here, however, does not rise to the level of structural error or plain error, the latter of which is discussed in greater detail below.

¶ 26. As indicated above, trial errors are discrete mistakes that "occur[] during the presentation of the case to the jury," while structural errors are those that "affect the framework within which the trial proceeds." Arizona v. Fulminante, 499 U.S. 279, 307, 310 (1991). Any error here falls into the former category even if it would have been better practice for the court to have inquired what, if any, questions the jury struggled to hear. Defendant fails to make a sufficient showing that this claimed error "affected the framework in which the trial proceeded, and thus, prevented the trial from serving its function as a vehicle for determining the guilt or innocence of the defendant." In re Hunt, 163 Vt. 383, 387, 658 A.2d 919, 922 (1995) (quotation omitted). Consequently, there is no structural error.

12

¶ 27. We note that defendant does not cite any cases where this type of alleged error was considered a "structural error." Other courts have concluded that these types of errors—in cases where jurors had difficulty hearing witness testimony—can be waived or are not considered "structural error." See Hodges, 2015 WL 5935408, at *3 (concluding that defendant failed to preserve argument that verdict should be vacated because some jurors did not hear all of the testimony at trial because he did not move for mistrial immediately upon learning of this information); People v. Mazur, 2024 IL App (5th) 210427-U, ¶ 53 (rejecting argument that jurors' indication that they had trouble hearing testimony of child witness was structural error requiring reversal; explaining that some testimony was repeated and there was already testimony in the record regarding the other subject elicited before any juror indicated that they were having trouble hearing); State v. Bailey, No. 69217-8-I, 2014 WL 5464696, at *4 (Wash. Ct. App. Oct. 27, 2014) (holding that trial court did not err by failing to sua sponte recall jurors to question if they could hear all testimony before ruling on motion for new trial where jurors' comments about not being able to hear were "scant in detail and inconclusive," it was not clear what portion of witness's testimony, if any, jurors were unable to hear, and there was substantial evidence in record to contradict assertion that jurors could not hear); State v. McGee, No. L-21-1077, 2022 WL 819044, at *5 (Ohio Ct. App. March 18, 2022) (rejecting argument that defendant denied fair trial where two jurors said it was difficult to hear a child witness's testimony but did not indicate that they could not hear it, and jurors were also provided a transcript of testimony without objection); cf. Turner, 521 N.W.2d at 151 (concluding, based on trial court's finding that several jurors could not hear material testimony that bore on defendant's guilt or innocence, that "prejudice must be assumed for the sake of insured fairness" (quotation omitted)).

¶ 28. To the extent that defendant asserts that this was otherwise plain error, we reject that argument. "Plain error exists when the asserted error: (1) is obvious; (2) affects substantial rights of the defendant; (3) brings prejudice to the defendant; and (4) seriously affects the fairness,

13

integrity or public reputation of judicial proceedings." State v. Bangoura, 2017 VT 53, ¶ 6, 205 Vt. 36, 171 A.3d 50 (quotations omitted). Defendant fails to make the necessary showing here. As set forth above, defendant testified to his version of events numerous times on direct examination and played for the jury a video reenactment of what he alleged had occurred. Defendant exhibited no difficulty in hearing the questions posed by his attorney, nor did the court indicate during defendant's direct testimony that it could not hear counsel. After the court notified the parties during a recess that the jury was having trouble hearing the attorneys, but primarily defense counsel, the State cross-examined defendant. As set forth above, the State referred explicitly to defendant's testimony on direct and questioned him about it. Defendant again provided his version of events, both in response to questions from the State and from his own attorney on redirect. We reject defendant's assertion, raised for the first time on appeal, that he was denied the right to present his case. Given the record here and the repetition of defendant's version of events both before and after counsel was again told to speak up, defendant fails to show that he suffered prejudice from the trial court's failure to sua sponte ask the jurors which questions they had difficulty hearing. He fails to show that the court erred in denying his request for a new trial on this ground.

¶ 29. We reach the same conclusion with respect to the microphone issue. As indicated above, the court informed defendant at the outset how defendant and his attorneys could have a private conversation and there is no persuasive explanation why the method proffered by the court did not suffice, what actual harm defendant allegedly suffered as a result, or why this would constitute plain error or structural error.

## B. Discovery Violation

¶ 30. Defendant next argues that the court erred in the way it treated the State's discovery violation. According to defendant, he was prejudiced by the State's late disclosure of the bartender's statement regarding what defendant allegedly said to the bartender on the night in

question, and the court should have granted defendant's request to strike the statement. Defendant contends that he was prejudiced because, had the statement been disclosed earlier, the defense would have deposed both the bartender and the officer to whom the statement was made.

¶ 31. Defendant raised this issue at trial as part of his motion for a mistrial, and the court rejected it. Defendant argued that the only remedy for the discovery violation was to strike the bartender's testimony. The court responded that it did not see how defendant was prejudiced by the late disclosure as it was not evident what defense counsel would have done with this information at the time he cross-examined the bartender. If there was something counsel would have done differently, the court indicated that it would allow him to recall the bartender to question him and this would remedy any existing potential prejudice. Defense counsel indicated that, had he known of the statement earlier, he would have deposed the bartender and investigated the bartender's motive to lie. The court responded that it would afford counsel the opportunity to depose or question the bartender outside the earshot of the jurors. Defendant declined to do so and declined to have the bartender recalled.

¶ 32. Defendant reiterated his discovery-violation argument in his motion for a new trial, and the court again rejected it, both at the hearing on the motion and in its written order. It explained that to establish reversible error for a discovery violation, "defendant must show both a violation of [Vermont Rule of Criminal Procedure 16] and resulting prejudice." State v. Streich, 163 Vt. 331, 349, 658 A.2d 38, 51 (1995). Defendant must show that the discovery violation caused him prejudice, not that the late-discovered evidence itself was prejudicial. State v. Provost, 2005 VT 134, ¶ 13, 179 Vt. 337, 896 A.2d 55. The court found that defendant failed to show that the discovery violation caused him prejudice. He did not point to arguments, testimony, or evidence that would have been different but for the late disclosure, nor how those differences would have been material. Defense counsel made a strategic decision not to depose the bartender, who was a key witness, before trial and it chose not to depose him during an offered recess at trial.

Defense counsel asked the bartender at trial why he had not disclosed the knife statement during defendant's bail hearing. In his motion, defense counsel referenced the court's failure to take judicial notice of the bartender's dismissed DUI charge at trial as potential prejudice, but defendant had declined the opportunity to recall the witness and cross-examine him on this issue. While the bartender's testimony itself may have been prejudicial, the court explained, that was not what mattered here. Defendant was required to show that the discovery violation was prejudicial and the court found that he failed to do so.

¶ 33. We review this decision for abuse of discretion, State v. Wade, 2003 VT 99, ¶ 9, 176 Vt. 550, 839 A.2d 559, and find no abuse of discretion here. Defendant essentially disagrees with the way in which the court exercised its discretion, which does not suffice. He reiterates his assertion that, had the statement been timely disclosed, he would have deposed the bartender and police officer and investigated the bartender's motive to lie. But the court considered and rejected those arguments as insufficient to show prejudice and articulated a reasonable basis for its decision. See Streich, 163 Vt. at 350, 658 A.2d at 51 ("This Court will not interfere with a discretionary action of the trial court as long as a reasonable basis exists for the court's decision" and "[t]o support a claim of error, defendant must show that the trial court's decision was untenable or clearly unreasonable." (citations omitted)). The court offered defendant various opportunities to remedy the discovery violation, but he chose not to pursue them. Defendant does not show that he was entitled to a new trial based on an alleged error in remedying the State's discovery violation.

C. Judicial Notice of DUI Conviction

¶ 34. Finally, defendant argues that the court should have granted his request to take judicial notice that the State had dismissed without prejudice a DUI charge against the bartender shortly before trial, several years after the bartender's statement to the police officer about defendant. At trial, just after the bartender finished testifying, defense counsel sought to have the court take judicial notice of the "DUI affidavit" and "notice of dismissal." The court questioned

16

why this would be appropriate as opposed to recalling the bartender. It offered to allow defendant to recall the bartender and defendant declined to do so. Defendant now argues on appeal that the DUI dismissal record was an "adjudicative fact" under Vermont Rule of Evidence 201 and that the court should have taken judicial notice of it.

¶ 35. We find no error. The court was not obligated to grant defendant's request. It provided a reasoned basis for denying this request and proposed an alternate way in which defendant could seek to introduce this evidence—recalling the bartender and asking him about it— and defendant declined to pursue it. As the court explained, taking judicial notice of this dismissed charge, without the bartender's testimony on the subject and the State's opportunity to redirect, would have turned the State into a fact witness in this matter. The court concluded that any probative value gained by taking judicial notice of the DUI dismissal was outweighed by danger of prejudice and confusing the jury. The court exercised its discretion in ruling on defendant's request and defendant's desire for a different result does not demonstrate an abuse of discretion. See Streich, 163 Vt. at 350, 658 A.2d at 51.

Affirmed.

FOR THE COURT:

_____
Associate Justice

17